## Ex parte Steinman and Hensel.

1. An attorney can only be disbarred for misconduct in his professional capacity or respecting his professional character.

2. Although there may be cases of misconduct not strictly professional which would clearly show a person to be unfit to be an attorney, as theft, forgery or perjury, but even for such an offence he cannot be summarily disbarred, without a formal indictment, trial and conviction.

3. Courts have jurisdiction and power upon their own motion, without formal complaint or petition, in a proper case, to strike the name of an attorney from the roll, provided he has had reasonable notice and an opportunity to be heard.

4. The office of an attorney is his property and he cannot be deprived of it unless by the judgment of his peers and the law of the land. To deprive him of it summarily for the publication of a libel on a man in a public capacity, or where the matter was proper for public investigation, would be an infraction of the spirit if not the letter of sect. 7, art. 1 of the Constitution.

5. A libel of the court, to amount to a breach of professional duty, must have been designed to acquire an influence over the judge in the exercise of his judicial functions by the instrumentality of popular prejudice.

6. *Query,* As to how far the provision of the Act of May 19th 1879, that the Supreme Court shall hear new testimony and decide the case *de novo* is consistent with the article of the Constitution which prohibits the said court from the exercise of original jurisdiction, except in a few specified cases.

June 17th 1880. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY, STERRETT and GREEN, JJ.

Writs of error to the Court of Quarter Sessions of *Lancaster county :* Of May Term 1880, Nos. 173 and 174.

The court below entered rules on A. J. Steinman and W. U. Hensel, to show cause why they should not appear and answer for contempt of court, and also why they should not be disbarred for misbehavior in their offices as attorneys of said court. The facts are fully stated in the following opinion of the court below, Patterson, A. L. J.

" Whereas, on January 20th 1880, in the presence of said court being then in open session, the judge then presiding sent a messenger of the court to inform the said A. Jackson Steinman, Esq., he being a sworn attorney and officer of this court, that the said court desired to see him, when, after a short period of time, the said A. Jackson Steinman, Esq., and William U. Hensel, Esq., another attorney and officer of this court (who had also been sent for by the court), both appeared before the said court, when the judge presiding addressed the following questions to the said Mr. Steinman, to wit : 'Mr. Steinman, are you the editor, or one of the editors and proprietors of the paper called ' The Lancaster Daily Intelligencer ?' He answered, ' Yes, I am one of them.' The following question was then addressed to Mr. Hensel : ' Mr. Hensel, are you the editor, or one of the editors and proprietors of ' The Lancaster Daily Intelligencer ?' He answered, ' Yes, I am.' Whereupon

[Ex parte Steinman and Hensel.]

the judge of said court presiding observed that he would read from that paper of yesterday's date (the 20th of January 1880), the following paragraph or article, to wit : 'Michael Snyder is acquitted, not because he had not violated the law, but because he had already been acquitted of the offence laid in the present indictment. That first acquittal was accomplished, as has been shown, by J. W. J., ex-chairman, J. H. B., ex-chairman, and District Attorney E., chairman of the Republican county committee, by false representations to the court, made for the corrupt consideration that the Snyders were the best Republican workers in the Eighth ward.' And having read thus far, the judge then said the following paragraph is what he desired to call their attention to, namely : 'Logically, the last acquittal, like the first, was secured by a prostitution of the machinery of justice to serve the exigencies of the Republican party. But as all the parties implicated, as well as the judges, belong to that party, the court is unanimous—for once—that it need take no cognisance of the imposition practised upon it, and the disgrace attaching to it.—Eds. INTELLIGENCER.'

And the same having been read, the court addressed the following question, viz. :—

" 'Mr. Steinman, did you write that article or paragraph ?' Mr. Steinman answered, 'I am one of the editors ; I am responsible as such.' The court then addressed the following question to Mr. Hensel : 'Mr. Hensel, did you write that article or paragraph ?' Mr. Hensel answered : 'It is not customary for us to tell who writes articles in our paper, but I accept the responsibility as one of the editors.'

" The court then addressed the following question : 'Mr. Steinman, do you adopt the wording or sentiment of that paragraph ?' He replied, 'I do not say so ; as editor of the paper I acknowledge I am responsible—I don't in any other way.' The court then addressed the following question : 'Mr. Hensel do you adopt the wording or sentiment of that paragraph ?' He replied, 'I choose to stand on my rights as editor, and in no other manner am I responsible for it.' The court then remarked : ' Gentlemen, you are not willing to adopt the article over your signatures, but you are officers of this court, and do not disclaim it, and under your several admissions here in court we will order rules on you to answer, and show cause why you should not be disbarred, etc. (or words to that effect), and remarked further, viz. : That the court could have no respect for itself or for the people who promoted us to administer the law if we failed to take notice of the article or paragraph reflecting on its integrity.' And then the court entered the two rules already recited, to wit, on January 22d 1880.

" On the return day of said rules, to wit, January 30th 1880, the respondents severally appeared in person in court, and by their attorney, and submitted severally their answers to said rules. At

[Ex parte Steinman and Hensel.]

the same time argument by their counsel was heard in their behalf.

"And it now becomes our unpleasant duty to consider and decide what further order under the law is required and imperative in the premises.

"The following are the answers, respectively, to the said rule, made, as required under oath, to wit:

"'And now January 30th 1880, the said Andrew J. Steinman, and the said William. U. Hensel, the said other respondent, made the same answer *totidem verbis*, comes into court, and, for answer to the foregoing rules to show cause why he should not appear and answer for contempt, respectfully says:

"'1. That the said proceedings are irregular and said rule was improvidently granted, because said rule was not entered upon a complaint, supported by an affidavit, setting forth the precise charges against him, but appears to have been entered by the court of its own motion, for matters not occurring in the presence of the court and of which the court had no judicial knowledge.

"'2. That the publication set forth in the prefatory part of said rule was made out of court in the Lancaster Daily Intelligencer, a newspaper published in the city of Lancaster by the respondent as one of the publishers of the said newspaper, and was made in good faith, without mailce and for the public good of and concerning a case of great public importance, which had been, before the writing of said publication, fully ended and determined, and in which the respondent had no interest as an attorney; and not of and concerning any case depending and undetermined in this honorable court, and therefore the respondent is not answerable, under the law, for a contempt by reason of said publication.

"'3. That the proceedings recited in the prefatory part of said rule as having taken place in the presence of the court did not occur in any legal proceeding in said court and were *coram non judice*, and the respondent is not answerable for any contempt by reason of any of said answers made in said recited proceedings, or by reason of his declining to answer any of the said questions propounded to him by your honorable court; but the said respondent says that having been sent for and interrogated as aforesaid by said court, he answered said interrogatories respectfully and truthfully, and was guilty of no contempt in the said recited premises.

"'Wherefore the respondent respectively submits that the said rule to show cause why he should not appear and answer for contempt should be discharged.

"'And for answer to the rule upon him to show cause why he should not be stricken from the list of attorneys for misbehavior in his office of attorney of this court, respectfully says:

"'1. That the said proceedings are irregular, and said rule was improvidently granted because said rule was not entered upon a

[Ex parte Steinman and Hensel.]

complaint, supported by affidavit, setting forth the precise charges against him, but appears to have been entered by the court of its own motion, for matters not occurring in the presence of the court and of which the court had no judicial knowledge.

" ' 2. That the said proceedings are irregular, because if the charge against him be that he published a libellous article in the said newspaper, of which he is one of the publishers, it amounts to an indictable offence, not committed by him in the presence of the court, or while acting as an officer of the court, and therefore he cannot be called upon to answer this rule until he shall have been tried and convicted according to law of said indictable offence; and he respectfully suggests that this court is not competent to determine, in this form of proceeding, that the respondent did unlawfully and maliciously publish, out of court, a libel upon the court, and to hear and determine disputed questions of fact, involving the motives of the respondent and the official conduct of the court itself.

" ' 3. That if it be intended to charge him with misbehavior in his office of attorney, by reason of the said recited occurrences in the presence of the court, said occurrences did not take place in any legal proceeding in said court, and were *coram non judice*; and the respondent is not answerable in this proceeding by reason of any said answer made in said recited proceedings, or by reason of his declining to answer any of said questions propounded to him by the court, but he says that, having been sent for and interrogated as aforesaid by the court, he answered said interrogatories respectfully and truthfully, and was guilty of no misbehavior in his office of attorney by reason of said recited premises.

" ' 4. The publication referred to was not made by the respondent within the presence of the court, or while acting as an attorney and officer of the court, or of, or concerning any case pending and undetermined in said court, but was made by him solely in his capacity as a publisher of a newspaper, out of court, and while acting in good faith without malice and for the public good, of and concerning a case of great public importance which had been finally ended and determined in said court, and in which the respondent had·not, at any time, been in any way employed or interested as an attorney, and which did not in any way involve his professional fidelity to the court; and he is therefore not answerable, as an attorney for his said act as a publisher of a newspaper; but if he has, in said publication, abused the freedom of the press guaranteed by the Constitution of this Commonwealth, he is liable to be indicted in the proper forum, and is ready to answer before a jury of his countrymen, according to the law of the land, for such abuse·of his rights under the law.

" ' 5. That the respondent has not been guilty of any misbehavior in his office of attorney.'

" It will be seen there are two rules entered, to which respectively

[Ex parte Steinman and Hensel.]

answers have been made—one on the respondents—that they answer for contempt; the other to show cause why they should not be disbarred for misbehavior in their office of attorney. We will not follow the interesting argument of the learned counsel who appeared for the respondents by entering upon any extended discussion of the law upon which the power of courts in matters of contempt rests under our system of jurisprudence. Nor is it at all necessary that we should in this proceeding attempt to state all the limitations which exist upon the exercise of that power in that behalf—the case before us not involving contempt in the presence of the court.

"It is manifest to the most casual reader that the several respondents do not deny the making or authorship of the said published article, or in the least excuse themselves for the same, or disavow even an intention by it to impute a want of integrity to the court. In other words, there is no disclaimer in their several answers whatever, of an intention to charge the court, in its official capacity, with anything other than what the words of the publication themselves plainly import, to wit: corruption—want of integrity in the office of judge. Every reader would attach that meaning to it. We can see in their answers no word or expression showing even an attempt to purge themselves of the breach of official fidelity which constitutes the gravamen of the rules entered upon them.

"The misconduct charged upon respondents nevertheless, by the first rule, it is manifest is not a contempt of court, in the presence of the court, and therefore the rule for 'contempt' must be and is now discharged.

"The single question remaining, and included in the second rule is, whether these respondents are guilty of such misbehavior in their office of attorney—such breach of professional fidelity—they, the respondents, both being sworn officers of this court, as will render them justly and legally liable to be fined, suspended or expelled from their office of attorney? Whatever may be the answer, the question is one of urgent significance to the court, to the respondents, and to the community; and it now devolves on this court to consider and determine what judgment should be enforced, if any, in the premises.

"This unpleasant task is not of our seeking, but was thrust upon us by these respondents. Indeed, the members of this court feel they would be justly chargeable with gross infidelity to the public duty if this publication was entirely unnoticed. We regret the occurrence and the necessity of taking official notice of it.

"The article itself is calculated to disturb and prejudice the mind of the public respecting the impartial and just administration of distributive justice, and in that way does great harm to the public as well as to this court. And the fact that the authors are both attorneys and officers of the court, doubtless intensifies the per-

nicious tendency of the article. Their answers admit actual participation in the act of publication. The charge contained in the publication, and of which the respondents acknowledge the authorship, is undoubtedly a very grave one. In direct and express terms it impeaches the *official integrity* of the court. Its effect is greatly to injure, if not to destroy, the moral influence of the court, and to impair confidence in the administration of public justice, and thereby inflict great harm on public society. And an officer of the court, capable of estimating the consequences of his act, publishing to the world an article of the character admitted, and totally unwarranted, involves a degree of moral turpitude that renders him unfit to longer occupy the confidential relation which the attorney necessarily sustains to the court, and in itself constitutes a gross misbehavior in his office. By such misconduct he is self-disqualified to be longer an officer of the court, and his removal becomes a necessity.

" We can find no statute provision in the state, nor do we believe it was ever intended there should be, to take away or abridge the power of the court to protect itself against one of its own officers, guilty of a delinquency of that nature, and who insists on the right, as in the present instance, to repeat the grave offence.

" His voluntary act, having wilfully disrupted the essential mutual confidence between himself and the court, his continuance in his office could only tend to obstruct or embarrass the court in the discharge of its official duties. In order to dispatch, indeed, in order to execute its adverse duties properly, the word of the attorney before the bench must be received and accepted by the court in multitudinous instances. But that cannot be done when confidence is wanting.

" Here the commission of respondents' act is palpable and intentional, its import or meaning is unequivocal. Their motive, though not openly or at all avowed in the publication, is too obvious to admit of doubt. The least reprehensible motive by which their professional misconduct can be supposed to have been animated is a desire for prominence or notoriety in the editorial corps. The real or true motive could be no other than partisan malice, or a wilful, headlong zeal to promote partisan interests in the face of their official fidelity to this court, and regardless of all consequences. Regardless of their civil and official duties, these respondents, when reminded of their obliquity of conduct by the rule to show cause, &c., in their answers thereto repudiate their sworn duty to the court—set at open defiance the social, official and moral obligations resting upon them as attorneys at law, and boldly assert exemption from all responsibility whatever. In that their folly was equalled only by their criminality.

" They claim that exemption in their answers set forth, because the publication made was made by them solely in the capacity of

14 NORRIS—15

editors and publishers of a newspaper, and made not in the presence of the court, and therefore in no manner involves their professional oaths as attorneys.

" Their answer also sets forth that they wrote and published the article while acting in good faith and for the public good, &c. In other words, they designed to say that they wrote and published, in this instance, from the enthusiasm of virtue, and not from motives of ambition, praise or notoriety.

" Such a sworn statement as to the legal and moral effect of the oath governing members of the bar is certainly remarkable. We consider the oath of an attorney vastly more comprehensive and binding than the answers of these delinquents import. We consider integrity, and especially integrity to the obligations of his official oath, as well as learning, is most essential to the character of an attorney. An attorney-at-law of the largest experience—the loftiest talents and most unexceptionable character, when he seeks a new forum to conduct a trial, is obliged to take the prescribed oath for attorneys before he is permitted to be heard in that court in behalf of his client.

" This required oath, or one similar in spirit, is as ancient as the common law itself, and to punish for an open violation of that obligation, has always been held as incidental to a grant of judicial power. Hence, can it be seriously urged that that answer can be accepted to go in excuse of this misbehavior in office by these respondents ? That because an attorney at law is at the same time an editor of a public paper, that the latter calling, and engaging in the duties of it emancipates him from all the obligations his oath as an attorney implies. That while within the four walls of the court chambers that obligation is binding, but the moment he steps without its walls the obligation is cancelled—the legal and moral obligation no longer exists ?

" The utterance itself of the proposition shows its wickedness and its folly. We can only entertain feelings of deprecation and sadness for any one, much more for an attorney at law, who can utter such a sentiment.

" The assumed calling of editors is voluntary upon their part, but does it sink the office and obligation of attorneys, who have never asked to be stricken from the roll of attorneys, but who are in daily practice before the court ? We think not—manifestly not.

" Of course, an editor or publisher, not an officer of the court, could not violate his official oath ; would not, by reason of any publication whatsoever, be responsible to the court in a proceeding for contempt, but only to the law in an action or prosecution in the courts.

" That distinguished jurist, C. J. GIBSON, in the Austin Case, 5 Rawle 202, says : ' An attorney-at-law is an officer of the court, and individuals of the class may, and sometimes do, forfeit their

[Ex parte Steinman and Hensel.]

professional franchise by abusing it; and a power to exact the forfeiture must be lodged somewhere, and such a power is indispensable to protect the court, the administration of justice and themselves.'

" These respondents are attorneys of this court, and as such, had solemnly taken the obligation 'that they would behave themselves in their office of attorney within the court according to the best of their learning and ability, and with all good fidelity, as well to the court as to the client.' They are also required to be persons of good moral character. And Justice ROGERS says, in the M'Laughlin Case, 5 W. & S. 272: 'And if he (the attorney) violates this obligation, he is liable to suspension, removal from office, or to such other penalties as have hitherto been allowed in such cases by the laws of the Commonwealth.'

" If, then, it is only with the official conduct of these respondents that the court can in these proceedings properly take cognisance of, is it not imperative to notice the false code of morals implied in their answers respecting the obligatory character of their official oath, as well as the overt act complained of?

" We have already remarked on the plea of their entire release from obligation as attorneys and officers of this court. The obliquity of the moral sense thereby indicated, if not sufficient in itself, would certainly make up a large element of character to constitute official misconduct and unfitness for the office of attorney.

" The power of the court to punish for official misconduct, as we have shown, is well established by authority. What, we will ask, is the character of the publication? We have shown its pernicious tendency, which is not disputed by the answers filed. The respondents nowhere, by their answers, allege its truthfulness. They nowhere deny its tendency to abuse public credulity, and to inflict deep injury upon the integrity of the court and its moral influence. What is the logical inference to be drawn from the respondent's sworn answers? Is it other than that they are privileged to make any publication concerning the court, and concerning proceedings in court, however false—even to assail its integrity, and to excite popular passion concerning cases determined therein, whether just or unjust.

" And, in absence of any disclaimer in their answers of any intention to embarrass the administration of justice, is it not fair to assume that the intention of respondents was to impair the court's official authority and influence? The language of the article, taken with their answers under oath, will admit of no other interpretation; no other than the intention to charge the court with partisan action in the cases referred to, and, of course, with a want of official integrity. There is no disavowal even of its natural meaning, or of a bad intent, and every man must be presumed to intend the natural and necessary consequences of his own deliber-

ate acts, and when, as in this instance, an opportunity was afforded the respondents to make a disavowal, either as to the motive that influenced them in its publication, and as to its meaning, and they declined to do either, it constitutes deliberate re-affirmation of the original article, with all its inherent consequences and meaning. The motive, therefore, was an impure one, and the publication a flagrant breach of official fidelity to the court.

" The respondents seek another excuse, by claiming to have made the publication for the 'public good.' If there were wrongs, real or imaginary, permitted in the trials referred to, it is remarkable that they were not seen or known to others than the respondents. If wrongs existed, of which we are unconscious, the law has wisely provided a mode of redress, well known to every lawyer, and no one seeking or claiming to be a public benefactor would for a moment think of employing any other. The members of this and all the courts in the Commonwealth are removable, if found unworthy, by the legislature; a mode provided, which is open to every member of the bar and to all other citizens. Their right to invoke such instrumentality as is prescribed by the Constitution and laws, could not be questioned or impeded in this or any other court, and would not affect injuriously the public welfare. And, we submit, to employ any other mode, and especially to excite the popular prejudice, and impair public confidence in the administration of public justice by publishing of and concerning the court, the grave charge that it was capable of 'prostituting the machinery of justice to serve the exigencies of a political party,' could not by any intelligent lawyer of pure character be considered as promotive of public good.

" It must be admitted that an overwhelming necessity only, which has not been attempted to have been shown to exist here, would justify an attorney-at-law in a course to degrade and scandalize, if not overawe and influence, the court in its administration, by publishing to the world an attack impeaching the official integrity of the court of which he is an officer. Such a proceeding under any other circumstances would show him to be greatly wanting in professional fidelity, and to be unsafe and unfit to be intrusted with the privileges and powers of his profession.

" From malicious and unjust attacks by the public press, calculated to impair public confidence in its integrity, and the honest administration of public justice, the court is protected, not for the sake of the judges presiding, but for the sake of the public and the suitors in their court.

" The misconduct, in this instance, is the act of these respondents as lawyers and officers of this court, and not their act as ordinary citizens; and with them, as editors and publishers, we have, therefore, nothing to do in this summary proceeding.

" We have already shown, we think, that the dual character of

lawyer and editor cannot be pleaded or admitted in justification of the transgressive act for which they are ruled to answer. Nor is the liberty of the press infringed by the supervisory and summary proceeding exercised by the courts over its officers. That opinion could only spring from the deficiency of an accurate knowledge of its true character, or from a desire to unjustly denounce and condemn its exercise.

" The seventh section of the ' Declaration of Rights' declares that ' every citizen may freely speak, write and print, on any subject— being responsible for the abuse of that liberty.' And the Act of 1836 also gives entire security to the press, and to any citizen, to publish and criticise the judges of our courts and their conduct, and the officers of the court, &c., without traducing character, or having the license of defamation. The public press, therefore, can be free in its widest and safest sense without that license, and such freedom of the press we, and every right-minded man, must believe is right, and is indispensable to the preservation of the freedom of the people; so this court could not, if it would, and it certainly does not for a moment desire to deny that essential right, either to the press or to the assemblage of the citizens. At the same time, it will be observed that the said Act of the General Assembly expressly clothes the courts of this Commonwealth with power to issue attachments for contempt of court, for the official misconduct of their officers. ' It is proper to remark that the powers of the court to punish the official misconduct of their officers, is expressly reserved in the Act of the 16th of June 1836,' is the language of Justice ROGERS, in the case of McLaughlin v. The Judges of the District Court of Philadelphia, 5 W. & S. 272.

" So that it is patent that neither the constitutional provision just quoted, nor the Act of 1836, gives to the public press, or to an officer of this court, the right to make and publish articles impeaching its official character, and thereby destroying confidence in it, and leading the community to disregard its official decrees.

" That has been, and is, we are of opinion, the law as held by our Supreme Court, and is sanctioned and enforced on the hypothesis that it is absolutely necessary to the advancement or due administration of distributive justice. It is not assumed that this proceeding could be supported, nor is it because the article in question was an attack upon the purity of the motives of the members of the court, while acting officially as a court.

" It is by virtue of the same inherent power that courts can protect counsel, appearing in its forum as officers of the court, from the effects of publications which are calculated to deter them from a bold and manly defence of suitors for fear of the denunciation of the public press.

" The publication in question was made out of the presence of

[Ex parte Steinman and Hensel.]

the court, by these respondents, its attorneys and officers, and in terms scandalizing and impeaching its integrity. Are they responsible and liable to punishment in a summary proceeding of this nature for constructive contempt or misconduct in office? This question has already been decided by our court of highest jurisdiction. In the Austin Case, 5 Rawle 204, that distinguished jurist, Chief Justice GIBSON, clearly announces the doctrine that officers of the court are so liable. He says, 'it is one thing to remove from office for unfitness, and another to punish for contempt.' In fact, the court may have recourse to both together, and there is no reason, therefore, why it should not be at liberty to proceed on the ground of unfitness and waive the contempt.

"It is not doubted that any breach of the official oath is a valid cause for proceeding for the former; for the man who deliberately violates the sanctions of a lawful oath proves himself to be unworthy of further confidence—society has no hold on him. The most significant breach of the fidelity enjoined may, therefore, be visited with this measure.

"But it is supposed that as this fidelity is exacted by the terms of the oath, but in the office of attorney, and within the court, the act which may violate it must be done in the face of the court. The oath undoubtedly looks to nothing like allegiance to the person of the judge, unless in those cases where he is so inseparable from his office that an insult to the one is an indignity to the other. In matters collateral to official duty the judge is on a level with the members of the bar, as he is with his fellow citizens—his title to distinction and respect resting on no other foundation than his virtues and qualities as a man.

"But it is nevertheless evident that professional fidelity may be violated by acts which fall without the line of professional functions, and which may have been performed out of the pale of the court. And, after remarking that such would be the consequence of beating or insulting a judge on the street, for a judgment in court, or of an attempt to control the deliberations of the bench by the apprehension of violence; or by an attempt to overawe the bench by menace, challenge, or the employment of an engine so powerful as the press, he remarks, 'to impair the general confidence in the purity and efficiency of the administration of distributive justice, is a vital injury to it, and the attorney who abuses the public credulity with a view to that effect, cannot complain if the faculties from which his capacity for mischief is mainly derived be taken from him.'

"Justice ROGERS, in the McLaughlin Case, 5 W. & S. 272, recognises the ruling in the Austin Case.

"In the case of Dickens, 17 P. F. Smith 169, Chief Justice AGNEW does likewise. He says 'the doctrine of the Austin Case is, that the power of the court may be exercised against the attor-

[Ex parte Steinman and Hensel.]

ney-at-law, either for a contempt, which is an offence against the court itself, or for unfitness, which disqualifies the attorney from filling the office properly.' In the present case no contempt was committed, and the expulsion rests upon the charge of unfitness to exercise the office of an attorney.

"It is clear that these Pennsylvania authorities require that the misconduct must relate to official misconduct of the attorney, and not his acts as a person merely, and that a breach of his official oath is such professional misconduct and constitutes a valid cause for removal.

"If this opinion would not become too extended, we could pursue this theme by the citation of numerous other authorities, outside of this state, but we will not.

"We have endeavored to present the misconduct of respondents, under the law, candidly, and to view their case dispassionately, and divested of all prejudice. We, indeed, postponed for a time final action to afford opportunity for calm consideration. And we are fully sensible of the deep obligation of this court to respect the just rights of the bar, in the exercise of this summary power of the court, and to abstain, as far as possible, from the exercise of all doubtful authority, while, at the same time, we wish it to be distinctly understood that no claim is put in for judicial irresponsibility. Further, we have been unable to perceive any peculiarity or feature in this case which exempts these respondents from the operation and effects of the well-settled rule of law in the premises.

"If this court, by its judgment, should commit error, and inflict thereby upon these respondents a deprivation of official privileges not warranted, we are pleased to know that there is a supreme judicial power in the Commonwealth to which, by the recent Act of the General Assembly, they can resort and secure a review of the proceeding of this court.

"In view of all the circumstances, and the law involved, we are unable to acquit these two respondents of misbehavior in their office of attorney.

"And this proceeding, we need hardly say, was not induced by any spirit of vindictiveness, and, therefore, even if sustained on review, we can now say that the restoration of respondents privileges as officers of this court, rests entirely with themselves.

"It remains only to pronounce the finding and express the judgment we feel obliged to enter, and which, we are authorized to say, is the judgment of the court.

"The court then being of the opinion, from the character of the article published—the then existing relations of respondents to this court, and from their answers filed, which concedes the deliberate making and publishing the same, we do find, and now adjudge, and the judgment of the court now is, that these two respondents are

guilty and convict of misbehavior in their office of attorney in this court.

" And; accordingly, we make the last aforesaid rule absolute, and order their names to be stricken from the roll of attorneys of the court."

The respondents took this writ and alleged that the court erred: 1. In entering of its own motion the rule to disbar the plaintiffs in error for acts not committed within its presence and of which it had no judicial knowledge without a complaint having been made, supported by affidavit. 2. In requiring the plaintiffs in error to answer a rule charging them with the publication, out of court, of an article which, if it was false and malicious, amounted to a libel, before they had been indicted and convicted according to law of said offence. 3. In making absolute the rule to disbar for the causes therein specified. 4. In not discharging said rule. ·

*Rufus E. Shapley*, *A. K. McClure* and *James E. Gowen*, for plaintiffs in error.—The court went beyond the law in summoning before it the plaintiffs in error, against whom no complaint nor proceedings were pending, and in calling upon them to avow or disclaim in court sentiments uttered out of court, and in seeking to compel them to inform upon themselves, and thus, if the article complained of did injustice to the court, to supply the foundation for a criminal proceeding.

The rule to disbar on account of a publication made out of court was irregularly and improperly entered, because it was not founded upon any complaint supported by affidavit: 1 Tidd's Prac. 3d Am. ed. 88; Ex parte Burr, 9 Wheat. 529; Walker *v.* Commonwealth, 8 Bush (Ky.) 86; State *v.* Kirke, 12 Fla. 278; Baluss's Case, 28 Mich. 507; Shuffeldt's Case, 56 Ill. 299; People *v.* Harvey, 41 Id. 77; In re ———, 1 Hun (N. Y.) 321; In re Hirst, 9 Phila. R. 216; In re Mills, 1 Mich. 392; Beene *v.* State, 22 Ark. 149; Perry *v.* State, 3 Iowa 550; State *v.* Wilkins, 3 Mo. 388.

As the plaintiffs in error were charged with the publication out of court of an article which, if it did injustice to the court, amounted to a libel, and which was not made by them as attorneys, it was error to require them to answer the rule before their trial and conviction of the alleged offence: Bacon's Abridgment, tit. *Attorney* H.; 1 Tidd's Practice, 3d Am. ed. 88 (citing 1 Bing. 102; Id. 142; 7 Moore S. C. 424); Anon., 2 Jurist 464, 467; In re ———, 3 Neville & Perry 389; Ex parte, 2 Dowl. P. C. 110; In re ———, 5 B. & Ad. 1088; Anon., 2 Hals. N. J. 163; In re Hirst, *supra.* Even if the article complained of was libellous, its publication was not a legal and sufficient cause for striking the plaintiffs in error from the roll of attorneys.

It was not published by them as attorneys, but as the publishers

of a daily newspaper, who had the undoubted constitutional right to speak and write of the conduct of courts and judges as freely as they might of the public acts of any other public officers. It was not published of or concerning any case with which they had ever been connected as attorneys. It was not published of a case depending in court, but of one which had been finally ended and determined. If it was libellous, the law provided two ample remedies, viz., a criminal prosecution and a civil action for damages. It is not usual for the court to interfere in a summary way in case of the misconduct of an attorney independently of his profession: Comyn's Dig., tit. *Attorney*, B. 15, note D. Courts will not exercise summary jurisdiction touching an attorney except in matters of professional conduct: In re Lord, 2 Scott 131; Ines *v.* Levi, 1 Hodges 195; Short *v.* Pratt, 1 Bing. 91; Smedley *v.* Joyce, 2 Dowl. P. C. 421; Ex parte Stokes, 1 Chit. R. 551, citing in notes (1819); Farmer *v.* Turner, Mich. T. (1815), MS.; Sedgworth *v.* Spicer, 4 East 570; Greggan *v.* White, 4 Taunt. 881. A case having a direct bearing on the one at bar is that of Edward Lechmere Charlton, reported in 2 Mylne & Craig 316.

In England it seems there are but two causes recognised as sufficient to justify the disbarring of an attorney, viz.: actual malpractice as an attorney, attended with fraud and corruption, and conviction of an infamous crime.

In this country, in addition to these two causes, a third is recognised, viz.: general bad character for integrity, such as shows the party to be unsafe and unfit to be intrusted with the powers of his profession: Austin's Case, 5 Rawle 191; McLaughlin's Case, 5 W. & S. 272; Jackson *v.* State, 21 Texas 668; In re Wallace, 1 L. R., P. C. 183; In re Malford, 1 Cal. 143; Baker *v.* Commonwealth, 10 Bush 592.

In Austin's Case, 5 Rawle 191, in 1835, upon which the court below rested its decision, the doctrine seems to have been advanced, for the first time in this country or in England, that a lawyer who would beat or insult a judge in the street for a judgment in court, or who would attempt to overawe the bench by menace, challenge, or that powerful engine, the press, would be guilty of such a violation of his professional fidelity as would justify his dismissal from the bar.

Surely that case does not justify the doctrine that any lawyer is liable to instant dismissal from the bar for hostile criticism out of court of the conduct of judges in cases with which he is not professionally connected.

*H. W. Palmer, John B. McPherson* and *S. H. Reynolds, amici curiæ.*—The respondents stand convicted by their own con-

fession of a false and defamatory libel on the court and we contend can be punished by disbarment for the offence.

The court below has fully argued the question in the very learned and unanswerable argument upon which it based its final judgment, and fully sustained its position that from the earliest times courts have exercised the right of self-defence by attaching, fining and imprisoning laymen and striking lawyers from the rolls, who have defamed them in the public prints, or who have sought to impair the confidence of the community in their integrity by unjust and unwarranted publications respecting causes pending and causes determined.

This is not the case of a party invoking the summary jurisdiction of the court on account of some alleged fraud or malpractice on the part of an attorney in his profession, neither is it the case of a party seeking to have the complainants disbarred by reason of the commission of some offence indictable at common law or by statute. It is a case in which the attorneys have grossly misbehaved themselves by the publication of offensive and insulting reflections upon the integrity of the court, of which the court have personal knowledge through the admission of the attorneys themselves. For such a grievous offence the court may upon its own motion enter a rule upon an attorney to answer for contempt, or a rule to disbar, based upon the maxim as old as the common law itself, "That the right of self-preservation is an inherent right in the courts:" Rice *v.* Commonwealth, 18 B. Mon. 472; Ex parte Fisher, 6 Leigh 619. Where the court has personal knowledge of the offence, it may elect whether it will proceed by contempt or leave the parties to an ordinary prosecution: Crawford's Case, 66 E. C. L. R. 612; Dandridge's Case, 2 Virginia Cases 408.

A court has power, on the ground of self-protection outside of the common law and statutory doctrine of contempt, to disbar an attorney who has shown himself unfit to be one of its officers, and such unfitness may be caused not only by moral delinquency, but by acts calculated and intended to injure the court: Ex parte Biggs, 64 N. C. 202; In re Moore et al., 63 Id. 397; People *v.* Turner, 1 Cal. 143; In re Wooley, 11 Bush (Ky.) 95; Leigh's Case, 1 Munf. 481; Ex parte Turner, 51 E. C. L. R. 773; Van Sandau, 6 Q. B. 784; 1 Phillips's Rep. 445; People ex rel. Moses et al. *v.* Goodrich, 69 Ill. 148. Blackstone divides contempt into two classes, direct and consequential, and among the latter enumerates " speaking or writing contemptuously of the court or judges acting in their judicial capacity, and by anything that demonstrates a gross want of that regard and respect which, when once courts are deprived of, their authority is entirely lost among the people:" 4 Black. Com. 285, 286. See, also, Reed *v.* Hugginson, 2 Atkyn's Ch. Rep. 469; Oswald's Case, 1 Dallas 319.

In the case of Thomas Passmore, the Supreme Court imposed a

fine of $50 and an imprisonment of thirty days, for a publication respecting a determined cause.   Articles of impeachment were preferred, and they were acquitted : Peck's Trial, p. 341.   In Freer's Case, 1 Caines 518, the offence was publishing "remarks tending to prejudice the public mind against the court."   He was punished, although disclaiming any intentional disrespect.   Says Chief Justice Kent, "Publications scandalizing the court, or intended unduly to influence or overawe their deliberations, are contempts which they are authorized to punish by attachment ; and, indeed, it is essential to their dignity of character, their utility and independence, that they should possess and exercise this authority."

Mr. Justice Holroyd, in King v. Almon, 4 B. & Ald. 232, says : "The power which the courts in Westminster Hall have of vindicating their own authority, is coeval with their first foundation and institution ; it is a necessary incident to every court of justice, whether of record or not, to fine and imprison for a contempt to the court, acted in the face of it: 1 Vent. 1.   And the issuing of attachments by the Supreme Courts of justice in Westminster Hall, for contempts out of court, stands upon the same immemorial usage as supports the whole fabric of the common law ; it is as much the 'Lex terrae,' and within the exception of the Magna Charta, as the issuing of any other legal process whatsoever."   See, also, State v. Morrill, 16 Ark. 518 ; McLaughlin's Case, 5 W. & S. 272 ; In re T. H. Grevy, 4 W. N. C. 308.   In 'Austin's Case, Chief Justice GIBSON, says : "It is the motive, therefore, that makes an invasion of the judge's rights a breach of professional fidelity ; from which he is to be protected for the sake of the public and the suitors of his court, not for his own.   To impair the general confidence in the purity and efficiency of the administration of distributive justice is a vital injury to it, and the attorney who abuses the public credulity, with a view to that effect, cannot complain if the faculties from which his capacity for mischief is mainly derived be taken away from him.   The power of the judiciary in this country rests upon the faith of the people in its integrity.   Take away this faith and the moral influence of the courts is gone and popular respect for law impaired.   Law with us is an obstruction. It is personified in the courts as its ministers, but its efficacy depends upon the moral convictions of the people.   When confidence in the courts is gone, respect for the law itself will speedily disappear, and society will become the prey of fraud, violence and crime."   (See In re Samuel Davis, 12 Norris 116—REP.)

Chief Justice SHARSWOOD delivered the opinion of the court, October 4th 1880.

The record before us has been brought up by a writ of error under the Act of Assembly approved May 19th 1879, Pamph. L. 66, entitled "An act regulating proceedings against attorneys-at-

[Ex parte Steinman and Hensel.]

law in this Commonwealth." It provides "that in all cases of any proceedings in any court of this Commonwealth against any attorney of said court for unprofessional conduct as an officer of such court, said attorney shall be entitled to a writ of error from the Supreme Court of this Commonwealth, as in civil cases to said court, from any judgment, order or decree of said court against him as such officer, which writ of error shall remove the record and all the proceedings therein to the Supreme Court of this Commonwealth; and it shall be the duty of said court to review the same *de novo*, and the complainant shall have the right to offer new testimony by deposition or otherwise, as said Supreme Court may direct, and upon hearing said court may modify, reverse or affirm said judgment, order or decree of the court below, as the justice of the case shall require." Other provisions are added as to the hearing of the cause in any district, and giving it a preference over all other than homicide cases, and as to the costs, all which, to say the least, are unusual. The remedy by writ of error, which properly requires two parties, is certainly not the best which could have been devised, and what is meant by reviewing the case *de novo* is not very intelligible unless it be from what follows that the court is to hear any new testimony which may be offered by the complainant, but not by the court below or any other parties, if there can be any others. On the whole it is a curious piece of legislative patchwork. How far the provision that this court shall hear new testimony and decide the case as if it was a new one consists with that article of the Constitution which prohibits the Supreme Court from the exercise of any original jurisdiction, except in a few specified cases, is a question which does not arise, as the controversy here is presented fully on the record, and we are not asked to look out of it.

The complainants were members of the bar of Lancaster county, and were also the editors of a newspaper published there. They printed in their paper an article very severely reflecting upon the conduct of the court in a certain prosecution in the Quarter Sessions, in which the defendant had been acquitted on an indictment for violating the liquor law. It charged that the acquittal "was secured by a prostitution of the machinery of justice to serve the exigencies of the Republican party," and added that as the judges belonged to that party it was "unanimous—for once—that it need take no cognisance of the imposition practised upon it and the disgrace attaching to it." We may safely assume that it meant to charge and did charge that the judge had decided the case wrongfully from motives of political partisanship. We have no hesitation in pronouncing such a publication to be a gross libel on its face. Nothing can be more disgraceful—not even perhaps that of direct bribery—than such an imputation on the motives of judges in the administration of justice.

[Ex parte Steinman and Hensel.]

The court thereupon sent for the complainants, and on their appearance and taking upon themselves the responsibility of the publication in question, entered rules upon them to show cause why they should not be disbarred and their names stricken from the list of attorneys for misbehavior in their offices as attorneys. To this rule they appeared and put in answers respectively, and the rules were afterwards made absolute.

Many objections have been raised to the proceeding, which we will not stop to consider. We entertain no doubt that a court has jurisdiction without any formal complaint or petition upon its own motion to strike the name of an attorney from the roll in a proper case, provided he has had reasonable notice and been afforded an opportunity to be heard in his own defence.

No question can be made of the power of a court to strike a member of the bar from the roll for official misconduct in or out of court. By the seventy-third section of the Act of April 14th 1834, Pamph. L. 354, it is expressly enacted that "if any attorney-at-law shall misbehave himself in his office of attorney he shall be liable to suspension, removal from office or to such other penalties as have heretofore been allowed in such cases by the laws of this Commonwealth." We do not mean to say—for the case does not call for such an opinion—that there may not be cases of misconduct not strictly professional which would clearly show a person not to be fit to be an attorney nor fit to associate with honest men. Thus if he was proved to be a thief, a forger, a perjurer or guilty of other offences of the *crimen falsi*. But no one, we suppose, will contend that for such an offence he can be summarily convicted and disbarred by the court without a formal indictment, trial and conviction by a jury, or upon confession in open court. Whether a libel is an offence of such a character may be a question, but certain it is that if the libel in this case had been upon a private individual, upon a public officer, such even as the district-attorney, the court could not have summarily convicted the defendants and disbarred them. The office of an attorney is his property, and he cannot be deprived of it unless by the judgment of his peers or the law of the land, this last phrase meaning, as we have been taught by Lord Coke, " due process of law." By the seventh section of the first article of the Constitution of 1874—the Bill of Rights—it is declared that " no conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or information where the fact that such publication was not maliciously or negligently made, shall be established to the satisfaction of the jury." This is a new and very important provision introduced into the Bill of Rights by the Constitution of 1873. It would be a clear infraction of the spirit if not the letter of this article to hold that an attorney can be summarily disbarred

for the publication of a libel on a man in a public capacity or where the matter was proper for public investigation or information ; for as he certainly does not forfeit his constitutional rights as a freeman by becoming an attorney, it guarantees to him immunity from all liability to punishment in the case of " the publication of papers relating to the official conduct of officers or men in public capacity where the fact that such publication was not maliciously or negligently made shall be established to the satisfaction of the jury."

But the gravamen of the offence of the complainants was that the publication was a libel on the court of which they were attorneys, and this, it is earnestly contended, was " misbehavior in their office," which gave the court power to exercise summary jurisdiction by removing them.

The duty of an attorney is briefly comprehended in the terms of his oath " to behave himself in the office of attorney according to the best of his learning and ability, and with all good fidelity as well to the court as to the client." Was the publication in question a breach of this oath ? Fidelity to the court includes many particulars, but they all evidently concern his official relations. " The sum of the matter," says Chief Justice GIBSON, in Austin's Case, 5 Rawle 205, "is that an attorney-at-law holds his office during good behavior, and that he is not professionally answerable for a scrutiny into the official conduct of the judges which would not expose him to legal animadversion as a citizen."

Some of the remarks in the opinion in that case have been much relied on by the learned counsel who argued as *amici curiæ* in support of the action of the court below. But there are two considerations bearing upon the question which now exist, but did not at the time that decision was rendered. The first is, the new provision on the subject of the liberty of the press which has been introduced into the Bill of Rights of the Constitution of 1874, and the second is that at that time the judiciary was not elective. Judges, in 1835, were appointed by the governor, and their tenure of office was during good behavior. There might then be some reason for holding that an appeal to the tribunal of popular opinion was in all cases of judicial misconduct a mistaken course and unjustifiable in an attorney. The proceedings by impeachment or address were the course and the only course which could be resorted to effectually to remedy the supposed evil. To petition the legislature was then the proper step. To appeal to the people was to diminish confidence in the court and bring them into contempt without any good result. We need not say that the case is altered and that it is now the right and the duty of a lawyer to bring to the notice of the people who elect the judges every instance of what he believes to be corruption or partisanship. No class of the community ought to be allowed freer scope in the expression or

[Ex parte Steinman and Hensel.]

publication of opinions as to the capacity, impartiality or integrity of judges than members of the bar. They have the best opportunities of observing and forming a correct judgment. They are in constant attendance on the courts. Hundreds of those who are called on to vote never enter a court-house, or if they do, it is only at intervals as jurors, witnesses or parties. To say that an attorney can only act or speak on this subject under liability to be called to account and to be deprived of his profession and livelihood by the very judge or judges whom he may consider it his duty to attack and expose, is a position too monstrous to be entertained for a moment under our present system.

In admitting, as he seems to do, that a libel on the court may be a breach of professional duty in an attorney, Chief Justice GIBSON adds a most material qualification. "The motion should be clearly shown to have been the acquirement of an influence over the judge in the exercise of his judicial functions by the instrumentality of popular prejudice." No such motive has been or can be imputed to these complainants. The learned judge who delivered the opinion of the court below imputes no such motive to them. He says : "Their motive, though not openly or at all avowed in the publication, is too obvious to admit of doubt. The least reprehensible motive by which their professional misconduct can be supposed to have been animated is a desire for prominence or notoriety in the editorial corps. The real or true motive could be no other than partisan malice or a wilful headlong zeal to promote partisan interests in the face of their official fidelity to this court and regardless of all consequences." Suppose the motives here assigned to be the true motives which actuated the complainants—a desire for notoriety, partisan malice, and a wilful headlong zeal to promote partisan interests—what had they to do with professional conduct or fitness to practice law? The complainants, in their sworn answers to the rule, aver that in making the publication in question, they were "acting in good faith, without malice, and for the public good."

Of course, we mean to express no opinion upon the merits of the controversy between the court below and the complainants. We concede to the court all that has been claimed on their behalf, that the publication in fact was a false and malicious libel, and that in making the rule absolute they were actuated by a simple desire to uphold the authority and dignity of the court. If this were a mere question of discretion, we are of opinion their order was a mistake. The Act of 1879 gives this court jurisdiction to review the discretion of the court below, and we think it was not in this case wisely exercised.

The order which made absolute the rules to show cause why the names of the complainants should not be stricken from the list of attorneys is hereby vacated

[Ex parte Steinman and Hensel.]

and the rules discharged, and it is ordered that the complainants be restored to the bar, the costs of this proceeding and writ of error be paid by the county of Lancaster.