## Chernoff's Case.

Argued April 20, 1942. Before SCHAFFER, C. J.; MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*B. D. Oliensis,* for appellant.

*Cadmus Z. Gordon, Jr.,* with him *John Wintersteen,* for appellee.

OPINION BY MR. CHIEF JUSTICE SCHAFFER, May 11, 1942:

August Chernoff appeals from a decree of disbarment. The proceeding was heard originally by a committee of the Board of Censors of the Philadelphia Bar. All the testimony was taken by the committee. The Board obtained a rule on the respondent to show cause why he should not be disciplined. A hearing was held before a special court consisting of a judge from each of the seven courts of common pleas. They unanimously ordered disbarment. The opinion of the special court was written by the distinguished President Judge of Court No. 4, Judge FINLETTER.

As to one of the charges against respondent, the court made findings, in which, after reading the testimony, we concur. We epitomize them as follows: Respondent, a member of the Bar, was also a detective in the coroner's office investigating the accidental death of a child caused by one Donner, who was held in bail on a manslaughter charge. He met Donner, told him the charge was serious, that he was in a "tough spot" and that he, respondent, was a detective in charge of the case, that it would take $200.00 to "stop the case" which would "have to be split several ways." This conversation was denied by respondent, who alleged that all he said to Donner was to suggest that he should secure a lawyer and volunteered to get one for him. More than a month

later he casually met a lawyer on the street and mentioned to him the representation of Donner. Nothing, however, was done. Donner did not see the lawyer. Respondent did not arrange that he should and, moreover, the lawyer did not authorize respondent to collect or receive a fee. The fact was that Donner already had employed an attorney, having secured his services on the day of the accident, to whom, immediately after it was made, he reported respondent's demand for $200.00. The attorney informed the District Attorney of what had taken place, and he assigned detectives to investigate. Under their instruction, Donner arranged for a meeting at his place of business with respondent. Donner was provided with $100.00 in marked bills. He asked respondent what he was to get for the money, to which reply was made, so Donner testified, that "he [respondent] was going to get me out of this", that it was a serious case, which might put him in jail. Donner gave the respondent the $100.00 and arranged for the further payment of a like sum. When the money was handed over, the detectives arrested respondent and took the marked money from him. Respondent's defense was that he took the money for delivery to the lawyer to whom he had spoken. The court in its opinion says: "We think it plain that even this excuse is not founded on fact. Donner did not need a lawyer. Mr. White had represented him from the date of the accident. It cannot be believed that he would have paid the, to him, large sum of $200.00 for a lawyer he did not need. Moreover the payment of money to respondent is not consistent with his own account of the facts. He says his conversation with [the lawyer he met on the street] was a casual one, the only purpose of which was a kindly service. . . . Both respondent and [the lawyer] say that the latter had not committed himself to taking the case. All [the lawyer] asked was that Donner be sent to him. Both say that respondent was not authorized by [the lawyer] to receive the fee, and certainly re-

spondent was not authorized to accept on account half the fee, which [the lawyer] had fixed. Under the circumstances as respondent relates the story, there was no legitimate reason why respondent should handle the money. The conclusion is in our opinion inescapable that the payment was made as a bribe to the respondent, or an extortion by him in return for stopping the prosecution." In these observations of the court we concur.

There were two other cases of solicitation or bribery and of extortion charged against respondent. A girl had been killed in an automobile accident. She was struck by a car driven by a Negro named DuPree. Respondent was assigned to investigate. Charles M. Ivins, Esq., appeared for the driver. In preparing the defense, an appointment was made with respondent at the latter's private law office at his suggestion. When they met, he told Mr. Ivins that "DuPree was in a bad spot and the only way he would get out of it was if he had a couple of hundred dollars to spend." Respondent said he was not interested in the money, but could advise Mr. Ivins where to spend it if he was interested in following the suggestion. This Mr. Ivins refused to do. Mr. Ivins testified that respondent said: "Philadelphia is a city of graft, and that is one way you could help your client." Respondent denied that he had made any improper suggestion to Mr. Ivins, and said that all he suggested was that the funeral bill be paid. The court below determined, as did the Censors, that the facts were as testified to by Mr. Ivins. We concur in this conclusion.

The third case was one in which, at the coroner's direction, respondent was assigned to investigate the case of a drunken man, who had been killed by the driver of an automobile named Curlis. The latter was represented by David F. Maxwell, Esq. In that case, as in the former one, a meeting was arranged by respondent at his law office, at which Mr. Maxwell, his client and the respondent were present. At the suggestion of respondent, Curlis left the room. Reciting what took

place, Mr. Maxwell testified: "I came back into his office, and he then stated to me that the case was far from clear, that the officers were placing a great deal of emphasis on the lighting conditions at the point where the accident occurred, that it was very well lighted, and any man could easily be charged with criminal negligence because of his failure to see this pedestrian. He said that he had a very good record while he was in the coroner's office for convictions, and that the police officers of the district were very anxious to get a conviction in this case, but that he had considerable influence with them, and, as I appreciated, the emphasis could be placed on the fact that the pedestrian was intoxicated or it could be placed upon the lighting effects at the point where it occurred. He said that, however, the police officers, he used the expression, 'were willing to play ball' if they were adequately compensated, but that it would be a mistake for me to approach them direct, and that on several occasions he had acted as intermediary for other lawyers who had requested it, and he would be very glad to do so in this case." Mr. Maxwell indignantly refused to enter into the arrangement, went to his office, dictated a statement of what had occurred and circulated it among his office associates as a warning. Respondent admitted having talked with Mr. Maxwell, but averred that all he had said was that it might be advisable for him to contact the police officer in the case. The Censors and the court below credited the testimony of Mr. Maxwell, as do we.

From the testimony, we reach the conclusion that the respondent was systematically engaged in soliciting bribes and extortion.

Respondent was indicted and tried for the crime involved in his relations with Donner. On his first trial, the jury disagreed and on a subsequent trial he was acquitted. He has not been tried for the other two offenses.

Two questions are raised on the appeal. Respondent urges that the evidence against him is not preponderant,

and that the proof of his alleged misconduct is neither clear nor satisfactory. We can dismiss this with the statement that, in our judgment, the evidence against him is preponderant, clear and satisfactory.

The second question, as stated by appellant, is whether an attorney may be disbarred in a summary proceeding, where his alleged misconduct was extra professional and entirely outside of his office of attorney. We think this misconceives the status of respondent. He was always an attorney. He could not take off his habilaments as such when committing crimes. Particularly is this true in matters affecting the administration of justice. "In his high office the attorney is a minister of justice": *Wolfe's Disbarment*, 288 Pa. 331, 334, 135 A. 732. All that respondent did in the affairs we are considering, he did in situations where the administration of the criminal law was being carried on; what he did was with the intent to unlawfully and unprofessionally defeat its purpose, and was violative of his attorney's oath of fidelity to the court.

Appellant's position, as stated in his brief, is "Since this case does not involve professional misconduct—an attorney and client relationship—it could not be dealt with summarily without a previous conviction by a jury or formal confession of guilt." To sustain his position, he relies largely upon language used in *Ex parte Steinman & Hensel*, 95 Pa. 220. We think even the observations there made are not to be restricted to an attorney and client relation. Certainly, if a lawyer not actually retained by and representing a client, had corrupted jurors or suborned witnesses in a case on trial at the suggestion of counsel therein, it could not be determined that he was not subject to disbarment until after trial by a jury and conviction. If such were the law, the attorney trying the case who had suggested or connived at the corruption could be summarily dealt with, while the one who had actually accomplished it, could not be until he had been tried by a jury, and if perchance

acquitted, not at all. In *Wolfe's Disbarment,* supra, we said: "Nor will the actual acquittal of the crime charged prevent action when appropriate."

We thus announced our attitude in a comparatively recent case, *Stone v. Board of Governance of the Pennsylvania Bar,* 312 Pa. 576, 578, 168 A. 473: "Since the creation of the Board of Governance, which is the instrumentality of the Bar to discipline itself, sanctioned and approved by us, the rule requiring prior convictions where the charge is criminal has no reason for existence." The Board of Censors bears much the same relation to the Bar as does the Board of Governance. It is an instrumentality of the Bar created by it to discipline itself. What was said about the Board of Governance, we now repeat with reference to the Board of Censors. When they report criminal conduct by a member of the Bar, established by credible and trustworthy testimony, the courts may exercise their power to summarily disbar without trial and conviction, and even though there may be an acquittal. The testimony in a criminal proceeding, which may raise a reasonable doubt in the mind of a jury, and for that reason lead to an acquittal, may carry clear conviction of guilt in the trained minds of judges.

In *Wolfe's Disbarment,* we cited with approval this language from the opinion of the Supreme Court of the United States in *Wall's Case,* 107 U. S. 265 (p. 336): "The proceeding [to disbar] is in its nature civil, and collateral to any criminal proceeding by indictment. The proceeding is not for the purpose of punishment but for the purpose of preserving the courts of justice from the official ministrations of persons unfit to practice in them." We further stated in that case (p. 337): "Acquittal of a criminal charge in Pennsylvania is no defense to actions where the misconduct under investigation shows unfitness of the attorney to be entrusted with the powers and obligations of his profession."

A further quotation from *Stone v. Board of Governance of the Pennsylvania Bar,* supra, is here pertinent

(p. 578) : "Before us he argued that as some of the charges made against him in which the hearing masters acted upon were crimes, he should not be disbarred because of these charges until after his trial and conviction. He cites to us *Snyder's Case,* 301 Pa. 276; *Ex parte Steinman & Hensel,* 95 Pa. 220. In the Snyder case, we said (page 286) : 'In the ordinary case an attorney's name will not be stricken from the rolls on account of an indictable offense until it has been disposed of in the criminal court.' The respondent's is not an ordinary case." So we say as to respondent, his is not an ordinary case. We remarked also in that case, quoting with approval from the Wall case: "The supension or disbarment of an attorney is, like his admission, a judicial act, based upon due inquiry into his fitness for the office."

In *Barach's Case,* 279 Pa. 89, 123 A. 727, where there had been an acquittal in the Federal Courts of criminal charges against an attorney-at-law, we decided that such acquittal did not prevent his disbarment on substantially the same charges. It was pointed out in that proceeding that the two cases are entirely different inasmuch as one is criminal and the other civil, and the evidence necessary to convict, and to justify the order of disbarment, is measured by different standards. In the former, the attorney is entitled to a jury trial, while in the latter, it is not a matter of right. In the former, he may not be required to testify, in the latter he may be compelled to do so.

We endorse what was said in the opinion of the court below: "The purpose of disbarment is not the punishment of the attorney, but the maintenance of the purity of the Bar. Disbarment is for the purpose of preserving the courts of justice from the official ministrations of persons unfit to practice in them."

Decree affirmed at appellant's cost.