# In re William A. Shoemaker, an Attorney at Law.

*Attorney at law—Power of courts to disbar.*

There can be no question that the court has the power to suspend or disbar an attorney at law if he shall misbehave himself in his office as such attorney.

An attorney at law, engaged as counsel for a defendant convicted of murder, presented to the court, on a motion for a new trial, an affidavit which he had prepared in the absence of and before he had met the witness. The attorney stated to the court, upon being questioned, that the witness had dictated the affidavit in his presence. It further appeared that a detective, engaged by the attorney to procure a witness to swear to certain facts, had pretended to do so, and having reported to the district attorney's office, was instructed there to ascertain more precisely what was wanted. He received the affidavit in question, took it to the district attorney's office, and, under instructions from one of the assistant district attorneys, he took a woman employed in the police department to the attorney, and she, under his instructions, signed and swore to the affidavit. *Held,* that such conduct was in violation of an attorney's oath and clearly justified the court below in suspending such attorney for the period of one year.

*Proceedings of disbarment or by indictment not alternative.*

It is not the law that the court cannot strike from its rolls the name of an attorney who has committed an indictable offense in his office of attorney while the indictment therefor is pending against him. Proceedings of disbarment and indictment are essentially different in their nature and purposes.

Argued May 10, 1896. Appeal, No. 82, Nov. T., 1896, by Williams A. Shoemaker, an attorney at law, from the decree of the court of O. & T. of Phila. Co., suspending appellant from his office of attorney for the period of one year. Before RICE, P. J., WILLARD, WICKHAM, BEAVER, REEDER, ORLADY and SMITH, JJ. Affirmed.

Rule to show cause why William A. Shoemaker should not be disbarred from practice as an attorney. Before THAYER, P. J., ARNOLD and WILLSON, JJ. The facts sufficiently appear from the opinion of THAYER, P. J., in support of the order of the court suspending appellant from his office of attorney for the period of one year from the date of said order.

The offense with which the respondent, William A. Shoe-

maker, was charged, and for which this rule was entered upon him by the court was an offense committed at the bar of the court, and in its presence. At the time the offense was committed the respondent, being then one of the attorneys for H. H. Mudgett, alias H. H. Holmes, was engaged in the argument of a motion for a new trial on behalf of his client, who had been convicted of the crime of murder in the first degree. In the course of his argument the respondent produced and read to the court what the evidence proves conclusively to have been a false and fraudulent affidavit, purporting to have been made by one Blanche Hannigan, and containing accounts of pretended interviews of the pretended witness with Benjamin F. Pitezel, of whose murder the said Mudgett, alias Holmes, had been convicted, in which interviews the pretended witness, Blanche Hannigan, swore to certain alleged threats of suicide, made by the said Pitezel in his lifetime. The materiality of the pretended affidavit to the question before the court consisted in the fact that the suicide of the murdered man had been one of the defenses made upon the trial of Mudgett, alias Holmes, for the murder of Pitezel. It appears by the evidence that the respondent had enlisted the services of one John Schwechler, a professional detective, to procure a woman who would swear to certain facts. Schwechler pretended to comply with the request, but went forthwith to another detective attached to the district attorney's office, F. P. Geyer, to whom he betrayed the whole matter. Mr. Geyer and Mr. Barlow, one of the district attorney's assistants, seem to have thought that it was for the interest of public justice that Schwechler should feign to comply with the request of the respondent and advised him after a conference with the district attorney to return to the respondent and ascertain more precisely what he wanted and what his plans were. Schwechler accordingly returned to the respondent, who, in his presence, dictated to a typewriter in his office the affidavit which was read in court on the argument for a new trial. No one was present at the time he did this but the respondent, Schwechler and the typewriter. The affidavit was composed and dictated to the typewriter wholly by the respondent, the pretended witness not being present or any witness whatever. The fabrication of the affidavit being thus completed the respondent handed it to Schwechler,

who was to get the woman who would swear to it. Schwechler having received it, immediately took it to the district attorney's office and gave it to Geyer. Thereupon Mr. Barlow suggested that a woman connected with the police department should be sent to Mr. Shoemaker's office to act the part of the required witness, who figured under the name of Blanche Hannigan. Accordingly, Mrs. Margaret M. Reah, a police matron, was sent for, and Mr. Barlow instructed her to go to Mr. Shoemaker's office and to say that she knew nothing of the contents of the affidavit, but that she would sign it for a consideration. Mr. Barlow testifies that he instructed her to sign the affidavit, but not to swear to it. This plan was carried out and Mrs. Reah went with Schwechler to Mr. Shoemaker's office to whom she was introduced as Blanche Hannigan. She told the respondent that she had come to sign the paper, that she did not know the contents, but would sign it for a consideration. The respondent said he did not have the money then but she should come again and he would see Holmes. Subsequently she called to see him when he handed her $20.00. The three, Schwechler, the respondent and Mrs. Reah then went together to the notary's office. There Mrs. Reah was by the notary asked if she knew the contents of the affidavit, to which, according to her testimony, she made no reply, but Mr. Shoemaker replied "Yes." According to the testimony of the notary, Samuel L. Taylor, Mrs. Reah, when asked if she knew the contents of the affidavit, made no reply, but bowed her head. Mrs. Reah then signed the affidavit and it was given back into Shoemaker's hands. Subsequently, as I have said, he brought it into court, and read it to the court. When asked by one of the judges if the deponent who made the affidavit was present when he wrote it, the respondent replied "Yes, it was written at the dictation of the deponent in my presence"—a statement which the evidence shows to have been false. Mrs. Reah had never seen the affidavit, nor had it in her possession, nor had it ever been shown to her, or read to her, nor was she asked any questions about the facts set forth in it, by the respondent.

The respondent's own account of the matter, as set forth in the answer which he has chosen to file to the present rule, is, that Schwechler had offered his services to him and related to him the facts which he had set down in the affidavit as facts

which he had a witness to swear to, and that the affidavit was drawn up from Schwechler's statements to him, but this, although contrary to the weight of the testimony, even if it was believed, and was in itself credible, or reconcilable with the other facts in the case, fails entirely to justify the defendant's conduct, or to explain it consistently with his integrity and truth in the transaction, for even his own statement of the affair fails to give any sufficient or justifiable reason for his procuring a person who was entirely unknown to him to swear to a statement, without reading one word of it to her, or showing it to her, or asking her any questions about the pretended facts he had written out for her to swear to.   This is the one accusing and unanswerable fact which utterly overthrows and destroys his attempted vindication.   He brought into court and read a pretended affidavit of his own make by a witness who was a perfect stranger to him, and of whom, although he had had several interviews with her about signing it, he had never asked a single question about the facts, or whether she had even so much as seen Pitezel in his lifetime.   He had abundant opportunity to question the proposed witness about the facts, but the evidence is conclusive that he never made the least allusion to them in her presence. His statement to the contrary in his answer is contradicted by the other witnesses, and is not corroborated by any evidence whatever.   His allegation that Mrs. Reah had the affidavit in her possession, and told him that the contents were true, is flatly contradicted by Mrs. Reah herself, and is, under the facts sworn to and the evidence in the case, unworthy of belief. Mrs. Reah has acted a very foolish part in this business, but she has not been shown to be unworthy of belief, nor did the respondent undertake to attack her character in any respect. She doubtless thought it her duty to comply with the directions given to her, and it was natural under the circumstances and in her situation that she should comply.   It does not detract from her credibility that she has been contradicted by the respondent.   He has, with the same facility, contradicted in his answer what the three judges who sat, the reporters of the public press, and every one in the court room distinctly heard him say, when he declared that the contents of the affidavit had been dictated to him by the witness who had sworn to it—a statement absolutely untrue, and which he does not now pre-

tend was true.   After the most careful examination of the facts, and with a sincere desire to give the respondent the benefit of everything that could be reasonably urged in his favor, we can come to no other conclusion than that the respondent is guilty of the offense imputed to him in the language of the rule which was entered upon him by the court in this case.   The offense he thus committed was one of the gravest character, it being no less than a violation of the solemn obligation he had taken upon himself when admitted to the bar, that he " would behave himself in his office as attorney within the court, and with all good fidelity, as well to the court as the client, and that he would use no falsehood."

The fact that the respondent was caught in the trap deliberately set for him by the officers of public justice, while it will doubtless, in the minds of some, be regarded as a mitigation of his offense, cannot reasonably be held to excuse or justify it. The trap in truth was of his own devising originally, but intended by him for a totally different purpose, viz : to ensnare justice in the very temple erected for her habitation.   The trap was so adjusted, however, by others that he was caught in it himself. I cannot, and will not, say one word in defense of the course of action which was then taken, or by way of apology for it.   In another place and at another time I have publicly expressed my disapprobation of all such methods, and I have not altered my opinion in the least concerning them.   The motives of the officers of justice were no doubt unimpeachable.   They apparently thought of but one thing, viz : to defeat a contemplated outrage upon the law, and a great wrong to the court.   They conscientiously, no doubt, believed that they were subserving the ends of justice in aiding the respondent to carry out his plans, and then at the critical moment uncovering the plot and exposing it in all its nefarious nakedness.   But no sophistry can successfully defend such methods.   They may well be left to those whose profession it is to deal in temptations, deceits and betrayals.   The law does not justify man-traps or spring-guns in legal proceedings, any more than it does upon the estates of noblemen at the present time.   The majesty of justice stands in no need of such means of defense.   She may well stand aloof and say, non tali auxilio.   The high respect in which I hold the district attorney's office, and its zealous, upright

and distinguished chief, who has rendered long and faithful service to the commonwealth, and whose high character shields his motives from all unfair inferences, forbids my completing the quotation. Justice bears the sword as well as the shield and helm of Minerva, and like her, was born armed, to show that she is invulnerable to all assaults. It required no resort to such practices. No countenance of contemplated wickedness. No pretended alliance with the wrongdoer. No encouragement, no help and no treachery on the part of others to baffle the unlawful search which was being made for a false witness. If the respondent had been let alone, who shall say that there might not have been for him some locus penitentiæ—some better second thought—some whisper from some good angel to resist temptation and to hold fast to truth, and duty, and honor, so that he might possibly have stopped short in the design which he was musing, and perchance have never consummated it at all. He had a right to the chance of that, and nobody had the right to deprive him of it. It is a matter of some uncertainty still how much of the original plan was the respondent's own, and how much of it was due to the suggestion of his confederate, Schwechler, for in no other light can I regard him, notwithstanding his betrayal of the plot to the officers of the law.

These considerations, while they cannot justify or excuse the defendant's conduct, nay, which cannot in any very great degree diminish the gravity of the respondent's offense, may, nevertheless, be properly considered by the court as justifiable grounds for a mitigation of the punishment to be imposed upon him. Taking into consideration all these things, together with the respondent's youth and inexperience, his overwrought but unjustifiable zeal to save his client's life, his dependent family, and his helpless condition if his profession should be taken from him, the court have determined not to impose upon the respondent the extreme punishment authorized by the common law as well as by the act of 1834 for such misconduct.

If any one shall be disposed to say that the punishment is inadequate to the offense, let him carefully reflect upon all the circumstances of the case, and remember also that mercy is no unfit companion of justice. And now, March 14, 1896, the order of the court is that the respondent, William A. Shoemaker, be suspended from his office of attorney for the period of one year from the date of this order.

*Thomas R. Elcock*, with him *F. Carroll Brewster*, for appellant.

The case assuming the attitude of the affidavit being offered with every qualification as to its correctness which an innocent person could offer. It being without malice, immaterial, and being the results of a combination to entrap him. How can the unfortunate Shoemaker be held guilty of any offense? If he is, of what does it consist? He was held by the court to bail for subornation of perjury. If any offense was committed, that was the one, but the court in passing upon the case acquit him of that, for they do not disbar him, but only punish him by suspension for a year. And for what, because he said the deponent had dictated the affidavit? Of what consequence was it who dictated it? Suppose Blanche Hannigan had in fact dictated it, how would that alter the case? Would she be any the less guilty of perjury or would the affidavit be any better or in any way admissible?

The simple dictation was not the point, it was procuring the witness to swear to it which was the offense, which was the crime of others. That offense is well defined and subordinates all other questions.

If this was the offense, then he was entitled to trial by jury, as a member of the bar cannot be convicted of so serious an offense without a trial, except in very extraordinary cases, of which this is not one. And the following authorities proclaim such doctrines:

In re Gates (2 Atlantic Rep. 216,217. Note of Reporter.). The power to disbar in a summary manner should be exercised with great caution: Rice v. Com., 18 B. Mon. 472. Under the Illinois statute the circuit court can only suspend; the power to disbar is vested in the Supreme Court: Winkelman v. People, 50 Ill. 449.

The application to strike the name of an attorney from the rolls should be denied where the evidence is conflicting as to whether he received the information which he disclosed, and which was alleged as misconduct: People v. Barker, 56 Ill. 299.

The North Carolina statute requires a prior conviction upon an indictment and verdict, and it takes away the common law power to strike from the rolls: Kane v. Haywood, 66 N. C. 1; see Ex parte Schenck, 65 N. C. 358.

Where motion is made to suspend and issue joined, defendant is entitled to a trial by jury: Reilly v. Cavanaugh, 32 Ind. 214.

Samuel Dickson and Richard P. White amici curiæ.

"Although, in ordinary cases, where an attorney commits an indictable offense, not in his character of attorney, and does not admit the charge, the courts will not strike his name from the roll until he has been regularly indicted and convicted, yet the rule is not an inflexible one; there may be cases in which it is proper for the court to proceed without such previous conviction, and the present case, in view of its special circumstances, the evasive denial of the charge, the clearness of the proof and the failure to offer any counter proof, was one in which the court might lawfully exercise its summary powers."

Ex parte Wall, 107 U. S. 265 (1882). If an attorney is liable to an indictment a rule to show cause why his name should not be stricken from the roll will be discharged.

OPINION BY SMITH, J., July 16, 1896:

This is an appeal by William A. Shoemaker, an attorney at law, from the decree of the court of oyer and terminer of Philadelphia, suspending him from his office of attorney for a period of one year. Under the provisions of the act of May 19, 1879, the appellant is entitled to have his case reviewed de novo. Whether that part of the act allowing new testimony to be submitted in the appellate court is of any force here in view of the act of June 24, 1895, providing that this court shall have no original jurisdiction except on writs of habeas corpus, need not be considered, as the case was presented to us upon the testimony introduced at the hearing in the court of oyer and terminer.

The appellant was interested as counsel in a motion for a new trial on behalf of H. H. Mudgett, alias Holmes, who had been convicted of murder in the first degree. In support of the motion, the appellant, on November 18, 1895, read and presented to the court an affidavit purporting to have been made by one Blanche Hannigan, wherein a fact was asserted, material to the main question. The district attorney, denying the genuineness of the affidavit, called the woman who subscribed

it, and other witnesses, to establish its falsity, and fraud in its procurement. In December following, a rule was entered requiring the appellant to show cause why he should not be disbarred as an attorney of that court, upon the ground that on November 18, 1895, he "produced and read to the court a false and fraudulent affidavit by one Blanche Hannigan, which was fabricated by him, and asserted that the said Blanche Hannigan dicated it to him;" to which the appellant made answer. A hearing of this rule was had January 11, 1896, when the appellant was represented by counsel, and witnesses were called in denial of some of the testimony adduced against him. On March 14, 1896, the court made an order suspending the appellant from his office of attorney for the period of one year from that date.

It seems that the district attorney, having learned that an effort was being made to procure a witness who would swear to alleged declarations of Pitezel (the man who was slain), sent for the detective, a man named Schwechler, who was endeavoring to secure such a witness and was then in communication with the appellant for that purpose. The detective disclosed the project to the officers of the law and showed them the affidavit in question, then unexecuted, whereupon it was arranged that the prosecuting officers would furnish a woman, a police matron, who would sign the affidavit for a consideration. The detective and the police matron visited the appellant's office twice. On the last visit she signed the affidavit under the assumed name of Blanche A. Hannigan, and it was attested by a notary public in the usual form. For this she received $20.00 from the appellant, who kept the affidavit and presented it in court as stated. The details of the transaction are fully narrated in the testimony, and from it we find the following leading and controlling facts : It is uncontroverted (1) that the allegations of the affidavit were false; (2) that it was dictated by the appellant to a stenographer, in the absence of the affiant and before he had ever met her; (3) that the appellant paid $35.00 in connection with its procurement, $20.00 of which went to the affiant; (4) that on the argument of the motion the appellant dwelt on the importance of the affidavit and stated he was "pleased to submit" it to the court, and after reading it, added, "To do justice to ourselves so far as our investigations have

proceeded *we have corroborated this in its entirety.*" The testimony also, in great preponderance, shows that the appellant stated to the court the specific falsehood charged against him and made the substantial basis of the rule, to wit: "that the contents of the affidavit had been dictated to him by the witness who had sworn to it," and this was correctly found by the court to be, "a statement absolutely untrue and which he (the appellant), does not now pretend was true." According to the record he presents to us, everything the appellant said and did in court, until the integrity of the affidavit was assailed, was in complete affirmance of its correctness and of his good faith and circumspection in securing it.

Not until it was manifest that the district attorney had abundant proofs to impeach it, did the appellant show any disposition to acknowledge the truth concerning the affidavit, and even then his admissions were limited to what was plainly incontrovertible. The appellant's own version of his connection with the procurement of the affidavit discloses a culpable indifference as to its truth or falsity; although the oath of an attorney that he will behave himself in the office "with all good fidelity, as well to the court as to the client, and will use no falsehood," plainly imposed on him the duty of diligence in discovering and excluding it. It is true the appellant in his answer denies any knowledge or intention of wrongdoing, and successfully impeaches the veracity of the detective he employed, but the unimpeached testimony and attendant circumstances are so clearly against him as to leave no reasonable doubt of his guilt.

In the light of the facts, upon no principle of truth or justice could we say that the court below erred in its conclusion. The distinguished counsel who presented his case to us urged that as the appellant was young, inexperienced and of a very nervous temperament, he should not be held to strict accountability for his conduct in court under the excitement of the proceedings; but it is quite evident from the order .entered, that the court of oyer and terminer made due allowance for his inexperience and mental equipment, if these can be offered in excuse for wrongdoing. We are all of the opinion that the action of that court was highly tempered with mercy, and that no room is left for its further exercise here.

The question of the power of the court to make the order

needs but little discussion. The seventy-third section of the act of April 14, 1834, provides that: "If any attorney at law shall misbehave himself in his office of attorney he shall be liable to suspension, removal from office, or to such other penalties as have heretofore been allowed in such cases by the laws of this commonwealth." The act for which the appellant was suspended was done by him as an attorney in open court, in a cause then being heard. He read the affidavit for the purpose of influencing the action of the court in a judicial proceeding, and it is immaterial what particular order was sought through its use. That it was intended as a fraud upon the court is certain, and the appellant's act in presenting it was clearly such misbehavior as the statute forbids, under penalty of suspension. It is not the law that a court cannot strike from its roll the name of an attorney who has committed an indictable offense in his office of attorney, while an indictment therefor is pending against him. The argument in support of this proposition overlooks the fact that proceedings of disbarment and by indictment are essentially different in their nature and purposes. A summary proceeding to disbar is limited to professional misconduct; it may be instituted in any court of record, by rule, motion, or petition; and it is to be disposed of by the court. Prosecution for a crime must be in a court of criminal jurisdiction, and be disposed of by the court and a jury upon indictment. Disbarment is for the purpose of protecting the courts and the public from an attorney whose conduct has shown him to be unworthy of confidence; but no criminal sentence can be imposed in such a proceeding. A prosecution by indictment is for the purpose of punishing the guilty, and by example deterring others from committing crime; but disbarment can be no part of the sentence. Furthermore, many causes for disbarment are not indictable, or otherwise within the jurisdiction of the criminal courts. Differing in purpose and effect, proceedings in one are in no wise dependent on proceedings in the other. An acquittal after trial under an indictment would, however, (in Pennsylvania) prevent disbarment for the alleged offense of which the defendant was acquitted. The suspension or disbarment of an attorney is, like his admission, a judicial act, based upon due inquiry into his fitness for the office. And when a court discovers that an attorney has ceased to merit its confidence in his

professional relations, its duty is to disbar him. These well established principles are abundantly illustrated and verified in the following cases, and fully vindicate the entire action of the court below: Brackenridge's Case, 1 S. & R. 187; McLaughlin v. The District Court, 5 W. & S. 272; Austin's Case, 5 Rawle, 191; Commonwealth v. Newton, 1 Grant, 453; Dicken's Case, 67 Pa. 169; In re Samuel Davies, 93 Pa. 116; Ex parte Steinman, 95 Pa. 220; In re H. T., 2 Pennypacker, 84; Serfass' Case, 116 Pa. 455; In re Gates, 17 W. N. C. 142; Splane's Petition, 123 Pa. 527; In re Van Horn, 135 Pa. 110; Saxton v. Stowell, 11 Paige, 526; In re Percy, 36 N. Y. 651; Ex parte Bradley, 74 U. S. 364; Bradley v. Fisher, 80 U. S. (13 Wallace), 335; Ex parte Robinson, 86 U. S. (19 Wallace), 505; Ex parte Wall, 107 U. S. 265-318.

The order of the court of oyer and terminer is affirmed, and the appeal is dismissed at the costs of the appellant.