# Dickens' Case.

1. An act highly discreditable but not infamous and not connected with an attorney's duties, will not give the court jurisdiction to strike him from the roll.

2. An attempt to make an opposing attorney drunk to obtain an advantage of him in the trial of a cause, is good ground for striking an attorney from the roll.

3. The duties, responsibilities and deportment of attorneys considered in this case.

4. Austin's Case, 5 Rawle 191, remarked on.

November 21st 1870. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Certiorari to the Court of Common Pleas of *Allegheny county:* No. 202, to October and November Term 1870.

On the 25th of April 1864, the petition of a number of the members of the Pittsburg bar was presented to the Court of Common Pleas of Allegheny county, setting forth that "a member

[Dickens' Case.]

of the Pittsburg bar (naming him) has been accused by the public journals and common report of being guilty of illegal practices and unprofessional conduct, unbecoming a citizen and a member of the bar, and subversive of the laws of the state, and the good order and well-being of society.

"Your petitioners therefore respectfully request your Honors to appoint a commissioner to investigate and report upon the truth of the above accusations, and that your Honors will take such further action in the premises as may seem meet."

The court thereupon appointed D. Ritchie, Esq., commissioner to take testimony and report the same, with the facts, to the court; and William B. Negley and M. W. Acheson, Esqs., to prepare charges and specifications, if deemed necessary, and conduct the proceedings on the part of the petitioners before the commissioner.

The committee reported the following charges and specifications:—

1. That on the 10th day of January 1864, "Russell's Panorama of the Rebellion," which was then on exhibition at Concert Hall, in the city of Pittsburg, was sold by a receiver under an order of the Court of Common Pleas, the respondent becoming the purchaser at such sale; after the sale the panorama continued on exhibition at the place aforesaid, and for several evenings respondent officiated at the treasurer's office; the advertisements of the exhibition offered gifts to those attending, to be drawn or distributed by lottery; that during one of these exhibitions (after the purchase by respondent aforesaid) Anthony Wiedman, Esq., a member of the bar, drew one of the gifts offered, viz., a silver fruit or cake basket; that during the day previous to the evening of this exhibition respondent furnished said Wiedman with a programme, the number of which he informed him would be called out for the basket; that at the instance of respondent it was then arranged between him and said Wiedman that the latter should take the said programme, attend the exhibition and receive the basket as though everything had been conducted in good faith, but it was further arranged that said Wiedman should return the basket to respondent the following day; that in accordance with this arrangement said Wiedman attended the exhibition, drew the basket and the next day returned it to respondent. * *

3. That on or about the 4th day of January 1864, while the Court of Quarter Sessions in and for said county was engaged in the trial of its December list, the respondent being then in court approached William Linn, Esq., a member of the bar, and stated to him that he (respondent) had the next case; that Jacob Whitesell, Esq., was the opposing attorney in the case, and that he (respondent) was playing a sharp game in trying to get him (Whitesell) drunk, and if he succeeded he could beat him; and

[Dickens' Case.]

the respondent did then and there request said Linn to take said Whitesell out of court and get him a drink; and it is charged that upon the occasion above referred to respondent did endeavor to make said Whitesell intoxicated in order to render him unfit properly to try his said cause, and with a view of obtaining an unfair advantage over him and his client, and that in furtherance of these objects he made the request of Mr. Linn above recited.

The following testimony was taken on the 3d specification:—

William Linn, Esq., sworn, testified: "I am a member of the Pittsburg bar; some months ago, I think in the early part of January, I went into the Common Pleas court-room, in the morning; respondent came up to me and said, 'I am playing a sharp game this morning;' I asked him what it was; he said that he and Mr. Whitesell had the next case to try; he said he was getting Whitesell drunk for the purpose of beating him; I asked him how he was doing that; he told me that Mr. Wiedman had had him out, and he mentioned the number of drinks—I don't remember how many, but it was several; I don't remember precisely what I said, but I expressed my disapproval—I turned away from respondent; a short time afterwards he came back to me and asked me if I would do him the favor of taking Mr. Whitesell out and giving him another drink; he also said he would give me the money or the change to pay for it; I became very much enraged, and declined, using violent and profane language not necessary to repeat; this was heard by Wiedman—he heard most of what took place between us, at least he was standing near enough; all that saved his dog skin was that we were in the presence of the court; I then went to Mr. Whitesell and told him what had taken place."

Jacob Whitesell, sworn, testified: "I am a member of the Pittsburg bar; about the beginning of January last, I was concerned, on the part of the Commonwealth, in prosecuting an indictment for assault and battery, with intent to commit a rape, against a man named Boyd; respondent was one of the counsel for the defence; Mr. Linn came to me in or close by the court-room, and informed me what he has sworn to here; I did not mention the matter to respondent then, but I did afterwards, in Squire Neely's office; we had an altercation about it, but I don't remember what was said."

For the respondent:

A. Wiedman testified: "I heard a conversation in the court-room between respondent and Mr. Linn about treating Mr. Whitesell, Mr. Linn met respondent inside the bar; I stood outside; they were facing each other; I heard respondent say to Mr. Linn that his case, The Commonwealth v. Boyd, would be the next called up, and if my recollection is right, he said further he would like to have this case continued, I understood also that Mr. White-

[Dickens' Case.]

sell was counsel on the other side, and then I heard respondent ask Mr. Linn if he would not take Whitesell out and give him a big horn or big drink, I am not certain which; Mr. Linn I saw looking down on the floor a little, and then respondent asked him whether he had change; Mr. Linn made some remarks in very violent language; he said, "I'll be God damned if I do it;" and then turned round and walked off; I did not hear anything said about my having taken Whitesell out and treating him five or six or any number of times; if I had heard any such thing I would have told respondent at once that it was an infamous lie; no such thing was said as long as I stood there; I was standing close to the outside of the railing, and respondent and Mr. Linn were standing close to it, inside of the bar, facing each other; so long as I stood there I heard all that was said; I was there till Mr. Linn left the court-room and went out; I made a remark to respondent that Linn was mad, and he had better let him go; I don't recollect precisely, but I think respondent remarked that Linn was drunk, or something like that."

On a question:

[Mr. Forward desires to ask the witness whether he (witness) did not think the proposition on respondent's part a jocular one.]

Witness said: "Respondent met Mr. Linn and was smiling when he made the proposition; this was the manner he acted; I do not remember whether I met Mr. C. B. M. Smith before the conversation or not; I met him afterwards; I don't remember whether I went with respondent to the court-house or not; Mr. Linn went into the court-room just before me, and I followed him in; respondent was already in the inside of the court-room; after I followed Mr. Linn out, I met Mr. C. B. M. Smith; he laughed, and asked me how many times I had Whitesell out to give him a drink, and made fun about it till at last I got mad; that is the only time I met Mr. Smith to the best of my recollection that day; the conversation between respondent and Mr. Linn took place openly; any one who was standing near could hear; I don't remember what day of the week this was; I know the case was not tried that day; how long afterwards before it was tried I do not recollect. In the morning in the office something was said about treating Mr. Whitesell by respondent; he laughed about it, and said he wanted to have some fun with Whitesell up in court, and we all laughed about it. This was before we went into court that morning. Respondent proposed to me that I should get him and give him a couple of good big horns; I received his proposition as a mere joke, and did not say anything in answer to it; if my recollection is right, respondent said Mr. Whitesell had been drunk the day previous, and he would like to have the case postponed on account of not being ready; this is all that took place in the office.

[Dickens' Case.]

" The case was tried by Mr. Kirkpatrick for Commonwealth, and Mr. Smith and respondent tried it for defendant; Mr. Whitesell was there with Mr. Kirkpatrick; I don't recollect who examined the witnesses, but I think Mr. Kirkpatrick."

C. B. M. Smith, Esq., testified : " Mr. Kirkpatrick was the principal counsel for the Commonwealth in the case of The Commonwealth *v.* Boyd; Mr. Kirkpatrick and Mr. Whitesell were counsel for the Commonwealth, and respondent and I for the defendant; I examined the witnesses and addressed the jury, but I did not regard the case as mine; I regarded myself rather as assistant to respondent; I do not know whether I was employed before respondent was or not, but my impression would be that I was not; I don't know of any serious proposition to treat Mr. Whitesell for the purpose of getting him intoxicated; there certainly was none made or thought of on my part, and so far as I know personally there was no serious proposal on the part of respondent to do so.   Before the case was tried respondent, Mr. Wiedman, and perhaps some others were in the office; I think respondent was also there at that time; some one, I don't know who, remarked that Mr. Whitesell had been drunk or on a spree, or something of the kind, a day or two before; and respondent, I think, in a laughing way, said it might be a good thing, or something of that sort, for Mr. Wiedman to give him a horn to get him to take a drink; I can't recollect what was said, as it made no sort of impression on me at the time; nothing further took place there; I don't know what Mr. Wiedman's reply was, but I certainly did not understand it as anything serious; there was a good deal of laughing about the case; afterwards I spoke to Wiedman about it in a joking way, as I certainly did not think he would attempt to do anything to Mr. Whitesell of that kind; he replied in the same way; I do not remember whether the case was tried that same week or not.   Mr. Wiedman and respondent occupied at that time the same office; Mr. Wiedman was in there at that time.   I know his sign had been on there before, and think it was at that time.   It was an office with two rooms; I don't remember the time of day when this conversation occurred; my impression would be that it was the latter part of the day.   I understood that Mr. Whitesell was one of the counsel in the case with Kirkpatrick, and that it was his case; I understood from Mr. Kirkpatrick that Mr. Whitesell was concerned in the case.   I had no consultation with Mr. Whitesell about the case at any time; I always spoke to Mr. Kirkpatrick about it."

On the return of the testimony by the commissioner, a rule was taken on the respondent to show cause why he should not be stricken from the rolls of the court.

He put in answer denying the jurisdiction of the court, and

[Dickens' Case.]

also answering as to the facts alleged. As to the 3d specification he said :—

" The 3d charge is wholly unfounded in fact, and is based upon either a wilful misrepresentation or misunderstanding of some jocular conversation had at the time, and occasioned by the following circumstances :—

" In the case of The Commonwealth *v.* E. F. Boyd, J. Whitesell, Esq., was known to be taking an active part for the prosecution, and on the day previous to the occurrence testified to by William Linn, Esq., the defendant had been ready with all his witnesses, and anxious to have the case tried ; and on application of the defendant's counsel to the district attorney to have the case called, he refused to take it up in the absence of Mr. Whitesell, who was not in court at the time, and in a state unfit to be there. On the succeeding day it happened that one of the defendant's witnesses could not attend, and when the counsel of defendant were talking over the prospect of obtaining a continuance of the case, some one (not affiant) suggested that if Mr. Whitesell was in the same condition as he had been the day before, there would be no difficulty about the matter, as the district attorney would not try in his absence. It was proposed by some one (not affiant) that Mr. Wiedman, who was present at this conversation, should give him a horn. This was said in a joking manner, and with no real intention of securing the intoxication of Mr. Whitesell, and was so understood, he believes, by all present. Some time afterward, the same morning when he (respondent) and Wiedman were going over to the court-room together, C. B. M. Smith, Esq., met them in the rotunda, when Smith asked Wiedman, ' Did you give Whitesell that horn, yet ?' the reply to which he (respondent) does not remember ; but a loud laugh followed on the part of Mr. Smith, and respondent passed on into the court-room. It was within a minute or two after this that he met with Mr. Linn, who is certainly mistaken in his version of what occurred, and the intention and meaning of what was said. Linn came up to where respondent was standing, and after the usual recognition respondent, still thinking and smiling over what had occurred in the rotunda, said, J. that dirty case is coming up, and we would like to get rid of it or have it continued ; the proposition is to give Whitesell a horn—won't you treat ? As respondent said this, Linn made no immediate reply, and looked down upon the floor ; when respondent added, have you change, when looking up Linn said, ' No, I'll be God damned if I do it,' and appeared to be excited and insulted. Mr. Wiedman, who was standing by and heard all that was said, remarked, ' Linn is mad, let him go' ; when respondent replied, ' No, he is drunk,' which he actually thought to be the case from his actions, his appearance and language at the time, and in which belief he is confirmed from his,

[Dickens' Case.]

Linn's, imperfect recollection, as shown by his testimony of what was said on the occasion.

"The case of Commonwealth *v.* Boyd was not tried that day, and not until the following week; that respondent did not treat said Whitesell that day, nor the day previous, nor at any subsequent time, nor did any other person for him, or at his instance; neither was there any intention on his part, or on part of any one, as far as he knows, to do so, or in any way interfere with the due administration of public justice."

The court, Mellon, J., delivering the opinion, held that they had jurisdiction of the case, that the charges in the 1st and 3d specifications had been sustained, and ordered the respondent's name to be stricken from the roll of the attorneys of the court.

Stowe, J., was of opinion that the court had not jurisdiction as to 1st specification, but concurred as to 3d, and in the order to strike the respondent's name from the roll.

A special Act of Assembly was passed, March 15th 1870, allowing the removal of the case to the Supreme Court, and directing that court to hear and determine all questions of law and fact, and make all orders to carry the act into effect.

A certiorari was accordingly issued, at the instance of the respondent, to the Court of Common Pleas, October 15th 1870; he assigned the order of the Court of Common Pleas for error.

*Moreland, Moore & Kerr* and *Wier & Gibson,* for certiorari.

There was no argument contrâ.

The opinion of the court was delivered, January 3d 1871, by

AGNEW, J.—This case comes before us under a special Act of Assembly, approved the 15th day of March 1870, authorizing us to take jurisdiction of it, and to proceed to hear and determine all questions of law and fact arising upon the record and proceedings in the cause. The name of J. Charles Dickens, an attorney of the several courts of Allegheny county, was, on the 26th of September 1864, stricken from the roll of attorneys of the several Courts of Common Pleas, Oyer and Terminer, Quarter Sessions and Orphans' Court. This resulted from an investigation ordered by the Court of Common Pleas upon the petition of members of the bar, charging Mr. Dickens with misbehavior in his office, as an attorney, upon three specifications, to wit, Participating in the exhibition of "Russell's Panorama of the Rebellion," and making pretended gifts at the close of each exhibition of valuables, as an inducement to draw full houses—Acting in bad faith and fraudulently in procuring the extension of the real estate of John F. Perry, under execution, with a view to-hinder and delay his bonâ fide creditors—And soliciting a member of the bar to make

[Dickens' Case.]

another member drunk, for the purpose of obtaining an unfair advantage in the postponement of a cause in which Dickens was attorney.

After a careful examination of the records and testimony in the case, we are of opinion that the 3d charge only is sustained. The 1st fails in point of law, and the 2d in point of fact. However unprofessional the conduct of Mr. Dickens was in relation to the exhibition of "Russell's Panorama," and we think it indefensible, his conduct on that single occasion ought not to be the ground of expulsion from his office of attorney. The doctrine of Austin's Case, 5 Rawle 191, is, that the power of the court may be exercised against attorneys at law, either for a contempt which is an offence against the court itself, or for unfitness, which disqualifies the attorney from filling the office properly. In the present case no contempt was committed, and the expulsion rests upon the charge of unfitness to exercise the office of an attorney. If an attorney should by a series of unprofessional acts, disgraceful to him as a man, form a character which unfits him for association with the fair and honorable men of the profession, and disqualifies him from receiving the confidence of men of integrity, bringing reproach upon himself and upon the profession to which he belongs, we will not say such unfitness, the result of habitual practices, cannot be made the subject of inquiry by the court and expulsion from the bar. But certainly an act merely discreditable but not infamous, such as a participation in making pretended gifts as a means of giving notoriety to an exhibition innocent in itself, while it would lose a member of the bar the favor and countenance of the high-minded men of the profession, cannot of itself give jurisdiction to the court to take judicial cognisance of it, and expel him from his office. To admit such a power would expose the members of the bar to the whims, caprice, peculiar views and prejudices of judges. The office of an attorney is too important to him, to those dependent on his efforts, and to the public, to be thus at the mercy of any one. The preparation of years to enable one to practise, and the prospects of a lifetime, ought not to be in the power of men, however upright, to blast, who, from peculiarity of disposition or habits of thought, may exercise the power unjustly. Austin's Case is a forcible illustration of the thought just expressed. We are of opinion, therefore, that the 1st specification, though true in fact, was insufficient in law to support the order of expulsion.

The second specification is unsupported by the evidence, and we need take no further notice of it.

But the third we regret to believe is well supported. The testimony of C. B. M. Smith, Esq., a highly respectable member of the bar, does not apply to the same time and place testified to by Mr. Linn. The conversation between Dickens and Linn, in which

the former told the latter of his purpose to make Mr. Whitesell, his opposing attorney, drunk, in order to beat him in the next cause coming on, and proposed to him to take Whitesell out and give him another drink, occurred in the court-room, and while the court was sitting. The conversation to which Mr. Smith refers took place in Dickens' office. No doubt Mr. Smith thought at the time it was a joke on part of Dickens; but the testimony of Mr. Linn, as to the occurrence in the court-room, leaves a very different impression on our minds; and the facts stated by him are corroborated by Wiedman, while the *opinion* of the latter does not cleanse the facts of their real color. We are compelled to conclude that Mr. Dickens was "playing a sharp game" as he expressed it, in earnest; and that he was engaged in the unwarrantable and highly censurable attempt to make his opponent drunk in order to take an advantage of him. This was a wicked act, as well as one which struck directly at the due administration of justice. In its effect and criminal purpose it differs none from tampering with a juror, corrupting a witness or bribing a judge. It strikes directly at the interests of the opposite party, with as great force as if he lost his cause from the misconduct of juror, witness or judge. The man who can do this thing is unfit to practise in a court where justice is administered, and should be expelled from its bar; or at least should be suspended from the practice until he has shown by sincere amendment, that his offence is thoroughly purged. The office of an attorney at law is a highly honorable one, as well as one of great importance to society. The necessities of men, in a state of high civilization, require the profession of the law as a distinct calling; one to be exercised by men trained to it by a long course of study, and qualified by skill and learning to understand, protect and assert the rights of others, who by reason of the state of society, or their own inability, cannot act for themselves. As property increases and new forms of it are developed, new institutions are created for its management; and as the business of society multiplies, interweaves and expands, and wealth and luxury follow in the train of commerce and the arts, the relations of men become more and more complicated and render the profession of the lawyer indispensable and important. Integrity, as well as skill and learning, is essential to the character of the profession, and it becomes the duty of the bench, as well as of the bar itself, to preserve that character in its highest state, as a means of usefulness, and of answering the true end of a profession so honorable and at the same time so needful. Notwithstanding the prejudices of some, the ignorance of others, and even the discredit occasionally brought upon the office by unworthy members, we are glad to know that the bar is filled with many worthy men, and that a trust and confidence almost unlimited is justly reposed in it by the public. In the present case the

[Dickens' Case.]

three judges of the court below agreed in opinion in finding the third specification to be true, and in this we find no error. We are compelled, therefore, to affirm the order of the court under that specification, leaving the appellant to make his application to the judges of that court for readmission, should they think his offence sufficiently atoned for by six years' exclusion from the practice of his profession in the courts from which he was expelled, and that he has retrieved his character by good conduct so as to warrant his return to practice there.

> Order affirmed upon the third specification of the complaint, with costs.