## Lemisch's Case.

Opinion by Mr. Chief Justice Kephart, March 23, 1936:

This appeal is from a decree of disbarment. Appellant was associated with Golder & Felger, attorneys. In 1926, the firm took him in as "a sort of partner, a qualified partner." In 1930, the name of the firm became Gartner, Felger & Lemisch. Felger, the senior partner and "boss," subsequently became ill and from July, 1933, until his death in early December of that year was absent from the office. After his death the firm continued as Gartner & Lemisch and employed, among others, one Brodsky, a member of the Bar.

Much of the work of this firm and of its predecessor was criminal trial work. These firms had many cases of defendants charged with carrying on illegal lotteries, that is, "numbers cases." This racket has been fully described in other opinions and the facts narrated in our opinion entitled "In re Disbarment Proceedings," as applicable to this case, are made part hereof.

We note, however, additional facts not common to the other cases. Kalman, an employee in appellant's office, received telephone calls as to arrests of numbers writers. He then arranged with one Seitchick, a professional bail procurer, to effect the release of the numbers writers on bail. Appellant or an employee of his office represented

these defendants before magistrates and in court, although defendants never asked appellant to represent them, never paid a fee, and were never asked for fees. Other persons paid Kalman for securing bail, and Kalman then paid Seitchick. He did practically all of the bail business, a great portion of which grew out of arrests for numbers, for the office of Gartner & Lemisch. Appellant was on familiar terms with certain numbers ring leaders who were part of the "69th Street Mob," a group of men "controlling" the numbers racket in Philadelphia. He had been attorney for some of these men and acted for one during the period herein involved.

The question, similar to that involved in the Herbert Salus case, is, does the evidence show an agreement or understanding between appellant and members of the numbers game that appellant or his office was to represent these members and their subordinates in the event of their subsequent arrest? The president judges below found that it did. As we said in the other opinions, though the evidence is circumstantial it is strongly persuasive and leads to but one conclusion—that of guilty connection with organized crime.

It was the practice in these cases, together with the admissions of appellant, his intimacy with prominent numbers racketeers, and the lack of an "explanation," that no doubt led the court below to say that "there can be no doubt of the fact" that appellant was guilty of complicity with the numbers racket in receiving illicit retainers.

The judges said: "There can be only one conclusion from the evidence, and that is that Mr. Lemisch permitted himself to become a party to a criminal conspiracy to violate the lottery laws. It is hard to believe that he was not a party to the illicit retainer from the beginning. It was he who had charge, for the firm, of all its criminal business. He was an intimate of the leading criminals. His partner Felger, upon whose shoulders he now seeks to lay the burden of making the

original criminal contract, admittedly attended only to the civil business of the firm. But whether or not it was Felger who accepted the retainer, and whether or not Felger kept all the illegal fees, the respondent Lemisch knowing the facts continued for months to carry out, perform and abet the crime."

Much of appellant's argument is based on the theory that it was the deceased Felger, if anyone, who was guilty of unprofessional conduct. Appellant contends that there was no real evidence that Felger, in consideration of a general retainer, undertook to defend or to have his office (Gartner, Felger & Lemisch) defend the smaller criminals. Appellant knew that Felger was on a retainer from the numbers heads. He testified: "I have heard that . . . Harry Felger got a weekly retainer . . . it was said that Felger had been retained on a weekly basis" for "that sort of numbers work." Asked if he had not interrogated Felger about retainers, appellant answered, "Mr. Felger was the type I could not interrogate. He was my boss." Appellant testified that until December, 1933, practically all of the numbers cases that Gartner, Felger & Lemisch represented were paid for, not by individual fees, but by certain lump fees on arrangements made between Felger and higher-ups whose names he did not know. Asked if he did not know he and Brodsky were in the retainer of the higher-ups to represent the subordinates in the numbers game, appellant exempted Brodsky as an employee of the office and said "but if because of the fact that I was Mr. Felger's partner and was lax in perhaps saying to him or even quarreling with him about fees, I would answer your question yes." Appellant admitted he knew "by indirection" the office representation of the numbers game was on a retainer basis by the bankers. When asked if he did not fail to make inquiries how the fees were being paid because he felt reasonably assured that was being taken care of by these bankers paying lump sums to the firm, appellant said: "That is a fact—that I had an

abiding faith that whatever Mr. Felger did was the right thing to do." That Felger was under a retainer appellant heard "in the way we hear all these things. . . . From those in the office. When we were sitting down in the office. . . . Brodsky and myself and Mr. Gartner and the girls in the office."

Appellant argues by the above statements he meant only to say "that he had come to realize, *at a later time,* on account of certain rumors that he had heard, and with the benefit of being able to review the situation in retrospect, that many circumstances were suspicious." Notwithstanding his explanation here of this testimony, it put him on notice that improper methods were being employed, and appellant knew before Felger's death that Felger and the office was on a retainer by numbers heads.

Counsel states, assuming Felger received general retainers from gamblers, the "gist of [his] defense is that he was not in fact a partner with Mr. Felger, but was only an employee, subject to all orders made by Mr. Felger, and, therefore, not responsible for his acts." The testimony shows appellant was a partner of Felger. In 1926, appellant testifies, he was taken "into the firm as a sort of partner, a qualified partner." The name of the firm became Golder, Felger and Lemisch. In 1930, Golder withdrew and Gartner's name was put in and the name became Gartner, Felger & Lemisch. This continued as the firm name until Felger died in December, 1933. Appellant often refers to this firm as a partnership. He testified, "Mr. Felger drew $125 a week and I did and Mr. Gartner did." It may well be that Felger was "boss" and appellant a mere junior partner, but the testimony indicates the firm was a partnership and that appellant was one of the partners and thus a partner of Felger.

Assuming, but not admitting, Felger was on a retainer from higher-ups in the numbers game and appellant suspicioned that this was true, appellant urges that about the time of Felger's death (December 6, 1933), he told

Brodsky "there has been a great number of criminal cases most of which have paid no fees, we have to pay rent . . . and henceforth I want fees paid in each and every case. . . . I am stepping out of the picture practically as far as criminal work is concerned . . ." and that this order shows a new system in the handling of all criminal cases, as distinguished from the Felger system. The evidence shows the Lemisch office continued to represent subordinate numbers men and it shows that fees were paid thereafter on behalf of subordinate numbers defendants by men who were reputed numbers leaders.

It was shown that fourteen subordinate numbers defendants—writers and pick-up men—were released from jail, had bail furnished them, were defended in court either by Brodsky or by appellant, and were neither asked for nor did they pay for any of these "services." The books of Gartner & Lemisch show in the case of one of the above defendants, Jesse Walker, who worked under one Banks, a reputed numbers head, a fee was paid by Banks between the time of arrest and time of trial. Appellant admitted as to the fee, Banks "paid it." In many of these cases, the firm books listed the names of defendants and under the heading "Net Receipts" indicated receipt of a fee for them, although the defendants themselves denied payment of the fees.

Kalman interviewed numbers defendants, collected fees and ran errands. He knew there were numbers retainers being paid to the office of Gartner & Lemisch. He knew defendants had their fees paid by such men as Banks. He knew when Banks telephoned about a defendant he was getting a numbers defendant out for Banks. When asked what particular mobs or groups of men controlling the numbers racket in Philadelphia the firm of Gartner & Lemsich represented, Kalman said: "There was a Mr. Banks, who, I understood, was a big number man, that was my thought."

Where agreements between attorneys and reputed criminals to violate the law have been shown to exist, we have not hesitated to disbar: *Stone v. Board of Governance*, 312 Pa. 576; *Wolfe's Disbarment*, 288 Pa. 331. We are required in disbarment cases by the Act of 1879, P. L. 66, to review the record and proceedings therein de novo. What we have said in other cases as to the findings of the court below need not be here repeated: *Moyerman's Case*, 312 Pa. 555; *Smith's App.*, 179 Pa. 14. While a preponderance of the evidence is necessary to establish an attorney's unprofessional conduct and the proof of such conduct should be clear and satisfactory *(Flanders v. Keefe*, 108 Wis. 441; *State Board of Examiners v. Dodge*, 93 Minn. 160; *Houghton's Disbarment*, 67 Colo. 511; *People v. Silha*, 252 Ill. 385), in this case, the logical inference that appellant was in league with organized crime is as weighty as any direct evidence could be.

We are mindful that the power to disbar must be exercised with the "utmost care." *(Maginnis's Case*, 269 Pa. 186) and is not an arbitrary or despotic one. But where an attorney's misconduct is shown "courts ought not to hesitate, from sympathy for the individual, to protect themselves from scandal and contempt, and the public from prejudice, by removing grossly improper persons from participation in the administration of the laws": *Ex parte Wall*, 107 U. S. 265.

The order of the court below is affirmed.