329 A.2d 235

**In the Matter of Norman SHIGON and Sheldon Portner, Appellants.**

Supreme Court of Pennsylvania.

Argued Sept. 24, 1973.

Decided Oct. 16, 1974.

Rehearing Denied Dec. 27, 1974.

2

4

———◆———

Thomas B. Rutter and Louis Lipschitz, Philadelphia, for appellants.

William P. Stewart, Sp. Counsel, Philadelphia, for appellee, Special Judicial Investigation.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

POMEROY, Justice.

In a joint trial before a three-judge court of the Philadelphia Court of Common Pleas, appellant Norman Shigon was suspended from the practice of law for a period of five years, and appellant Sheldon Portner for a period of two years. Each has appealed to this Court.[1]

The conduct of which appellants were found guilty included sixteen charges (out of 23 asserted) of improper solicitation, fifteen charges (out of 16 asserted) of submitting inflated and fraudulent medical claims to insurance carriers, seven charges (out of 11 asserted) of submitting false information to the court of common pleas, and five charges of attempting to impede the Special Judicial Investigation in Philadelphia.

The appellants argue that there was either no evidence or insufficient evidence to sustain these findings of guilt, and that, in any event, the procedures under which they were investigated and tried were unauthorized and, in some respects, ultra vires, and that the procedures violated their constitutional rights to due process of law, to equal protection of the laws, and to refrain from giving evidence against oneself. Appellant Portner additionally argues that he has been held responsible for unethical acts committed by appellant Shigon without proof that he had any knowledge of such acts. Our review of the record and the applicable law satisfies us that these contentions are without merit; we will therefore affirm.

1. The appellate jurisdiction of the Supreme Court is found in The Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, art. 2, Section 202(6), 17 P.S. § 211.202(6).

## I.

## BACKGROUND OF THE CHARGES

On March 1, 1971, there was presented to the Philadelphia Bar Association a report by its special counsel, Morton S. Jaffe, Esquire, who had been engaged for the purpose of conducting an investigation into unethical solicitation of lawsuits by members of the Philadelphia bar. The report, sometimes called the "Jaffe Report" after its author, was entitled "Report to the Committee of Censors[2] of the Philadelphia Bar Association of the Investigation into Unethical Solicitation".[3] The Philadelphia Bar Association submitted the report to the court and sought an order establishing procedures to be followed in implementing it. The court entered such an order on April 26, 1971, followed by an amended order on June 3, 1971, and by a supplementary order on August 19, 1971. The latter order, *inter alia*, transferred responsibility for the investigation from the Committee of Censors to special counsel to be appointed by the court. A further amended order was entered by the court on its own motion on October 28, 1971, and it is this order which is the basis of the instant proceedings.[4]

---

2. The Committee of Censors was a committee of the Bar Association appointed with the approval of the court of common pleas pursuant to the Act of June 4, 1919, P.L. 384, § 1, as amended; 17 P.S. § 1665.

3. The opinion of the court below states that the investigation by Mr. Jaffe was discontinued after nineteen months because funds provided by the Bar Association were exhausted.

4. All of these orders were signed by the Honorable D. Donald Jamieson, President Judge of the Court of Common Pleas of Philadelphia. His action in removing responsibility for the investigation from the Committee of Censors was approved by the Board of Judges of the Court of Common Pleas of Philadelphia by resolution adopted September 23, 1971. The same resolution authorized the appointment of special counsel, with appropriate staff, "to review the censors' investigation, to undertake further action where necessary, and prosecute where appropriate". The resolution also authorized the President Judge to promulgate "appropriate regulations for the conduct of the investigation".

The order of October 28, 1971 provided that, in the first instance, the evidence (including the testimony of an attorney under investigation) adduced by the special counsel with respect to any member of the bar should be heard *ex parte* by a judge to be appointed for the purpose, and that such judge, "if he concludes that such evidence warrants the institution of formal charges against one or more members of the Bar of this Court, shall so certify to the President Judge who shall appoint a three judge panel to conduct such formal proceedings and to impose such discipline as may be warranted by the evidence". The order granted to special counsel "the power to compel the appearance of relevant witnesses and the production of relevant evidence by subpoena". The preliminary hearing judge was empowered to hear and determine any issues raised with respect to compliance with the order, including the failure of a witness to appear or to produce evidence subject to subpoena.[5]

---

**5.** The full text of the order of court entered October 28, 1971 is as follows:

"ORDER OF COURT

"AND NOW, to wit, this 28th day of October, 1971, the Court amends its order of August 19, 1971, upon its own motion, as follows:

"1. Responsibility for investigation into alleged solicitation of negligence cases by members of the Bar is herewith transferred from the Committee of Censors to Special Counsel heretofore appointed by the Court and such Assistant Counsel as may from time to time be appointed by the Court.

"2. The responsibilities of Special Counsel shall include reviewing, investigating and completing the interim report described and known as "Report to the Committee of Censors of The Philadelphia Bar Association of the Investigation Into Unethical Solicitation." dated March 1, 1971.

"3. Special Counsel shall be governed by the following procedure:

"a. Witnesses having relevant evidence summoned by Special Counsel, including the attorney under investigation, shall be examined ex parte under oath before a judge of this Court appointed for that purpose by the President Judge.

"b. The judge so appointed shall consider the evidence adduced before him with respect to any member of the Bar of this Court, and, if he concludes that such evidence warrants the institution of formal charges against one or more members of the Bar of this Court, shall so certify to the President Judge

The Jaffe report having identified appellants Shigon and Portner as persons who may have violated the proscription against solicitation, they and a number of

who shall appoint a three judge panel to conduct such formal proceedings and to impose such discipline as may be warranted by the evidence.

"c.   The judge so appointed may, at any time while the matter is still pending before him, enter an order imposing discipline stipulated by the attorney under investigation and Special Counsel if, on the basis of the evidence adduced before him, the judge so appointed finds that justice will adequately be served thereby.

"4.   All proceedings hereunder shall be confidential prior to the filing of formal charges after which further proceedings shall be held in open Court.

"5.   Special Counsel is hereby granted the power to compel the appearance of relevant witnesses and the production of relevant evidence by subpoena.   Any issues raised with respect to compliance with this provision of the Order, or the wilful failure of a witness to appear or to produce evidence subject to subpoena, shall be heard and determined by the judge appointed pursuant to Paragraph 3 hereof.

"6.   The Court directs all members of its Bar to cooperate with the investigation.   Any member of the Bar of this Court who fails to appear, to answer questions or to furnish records and other evidence in response to requests therefor by Special Counsel or by this Court, except on valid grounds of privilege or relevancy, having failed to furnish the Court with information necessary for it to determine whether he is entitled to continued certification to the public as fit to practice, shall, upon proper proof of such failure to cooperate, be subject to disbarment.   Any violation of this provision of the order, or any issue raised thereunder, including the imposition of discipline, shall be heard and determined by the judge appointed pursuant to Paragraph 3 hereof.

"7.   Any attorney involved in the investigation, whether as Special Counsel, or as a member of the Bar of this Court under investigation, or as Counsel to any party or witness, or as a witness who shall make any public statement concerning the investigation or any particular proceeding resulting therefrom not authorized by Disciplinary Rule 7-107 of the Code of Professional Responsibility, shall be guilty of misconduct and subject to discipline.   Any violation of this provision of the order, or any issue raised thereunder, including the imposition of discipline, shall be heard and determined by the judge appointed pursuant to Paragraph 3 hereof.

"8.   Special Counsel shall be charged with the obligation of acting as promptly as possible consistent with the rights of all parties involved.

"9.   Special Counsel shall submit interim reports quarterly.

"10.   The Court, upon his taking the proper oath of office, herewith admits Michael Franck, Special Counsel, to practice

their clients and other relevant witnesses were summoned by special counsel to appear before the Hon. Kendall H. Shoyer, who, on November 9, 1971, had been appointed as the preliminary hearing judge under the order of October 28th. On April 6, 1972, Judge Shoyer certified that charges of professional misconduct by appellants, as set forth in a petition of special counsel for imposition of discipline, appeared to be warranted. President Judge Jamieson thereupon appointed three other judges of the court of common pleas to constitute the Special Disciplinary Court in this matter.[6] Respondents filed preliminary objections and other pre-trial motions relative to the proceedings which were in due course heard and overruled or denied.[7] Thereafter, responsive answers were filed to the petition for imposition of discipline, in which all substantive charges, with one exception, were denied,[8] as was the existence of a partnership between Shigon and Portner. The case went to trial on September 11, 1972, and consumed 15 trial days. The opinion of the court en banc and its order imposing discipline were filed April 2, 1973.[9]

specially for the purpose of conducting the investigation and any formal disciplinary proceedings arising therefrom.

"11. The President Judge will provide a proper staff and offices for Special Counsel to carry out this order.

BY THE COURT:

s/JAMIESON ·

——————— J."

6. The judges so appointed were the Hon. Frank J. Montemuro, Jr., the Hon. Ethan Allen Doty and the Hon. Samuel J. Rosenberg.

7. Appeals from these orders were taken to this Court and, on June 26, 1972, were quashed as being from interlocutory orders.

8. The exception was the non-filing of "distribution statements" as required by Rule 202 of the *Philadelphia Court of Common Pleas*. Since the court below did not adjudicate the validity of this rule or impose any discipline for its violation, the charge is not before us on this appeal. Opinion of Montemuro, J., for Disciplinary Court (Portner Record, 296a).

9. Between the date of the inception of this proceeding and the order of the lower court imposing discipline, this Court adopted its Rule of Disciplinary Enforcement. The order of adoption was

## II.

## REGULARITY OF THE PROCEEDINGS

Initially we must consider the challenges which appellants make to the propriety of the procedures leading to the orders imposing discipline. Appellants do not dispute the power of a court to disbar, suspend or otherwise appropriately discipline members of its bar. *Schofield Discipline Case,* 362 Pa. 201, 204, 66 A.2d 675 (1949). As we noted in that case, the power has been exercised in the United States and England from the earliest times. *Ibid.* n. 1. It has been statutorily recognized in this Commonwealth since 1834. Act of April 14, 1834, P.L. 333, § 73, 17 P.S. § 1661.[10] This power to discipline, however, is not to be exercised arbitrarily. As this Court has long recognized, "[t]he right to practice law is constitutionally protected as a property right and no attorney can lawfully be deprived of such right except by due process of law and upon competent and relevant proofs sufficiently credible to support a just order of disbarment". *Schlesinger Appeal,* 404 Pa. 584, 596, 172 A.2d 835, 840 (1961). *See also Pennsylvania State Board of Pharmacy v. Cohen,* 448 Pa. 189, 199, 292 A.2d 277, 282 (1972); *Ex parte Steinman and Hensel,* 95 Pa. 220, 237 (1880). "Disbarment, designed to protect the public, is a punishment or penalty imposed on the lawyer . . . He is accordingly entitled to procedural due proc-

dated March 21, 1972 to be effective September 1, 1972 (later extended to November 1, 1972). 446 Pa. xxiv. Rule 17–25 provided that "these Rules shall not apply to any special judicial investigation in existence at the time of the adoption of these Rules, which, together with any disciplinary proceedings arising therefrom, shall be concluded under the procedure established for the conduct of such investigation." The decrees appealed from were within the competence of the court below. *See Montgomery County Bar Association v. Hecht,* Pa., 317 A.2d 597 (1974).

**10.** This Act, and others relating to the disciplining of attorneys at law for misbehavior, has been suspended by Rule 17–24(a) of this Court, effective September 1, 1972 (a date later extended to November 1, 1972).

ess, which includes fair notice of the charge." *Re Ruffalo*, 390 U.S. 544, 550, 88 S.Ct. 1222, 1226, 20 L.Ed.2d 117, 122 (1968). The same may be said of the lesser penalty of suspension.

██ The power to impose discipline on members of the bar in Pennsylvania lay not only in this Court, but also in the several courts of common pleas as to lawyers who were members of the respective bars of such courts.[11] *See e. g., Austin's Case*, 5 Rawle 191 (1835); *Dicken's Case*, 67 Pa. 169 (1870); *In re Davies*, 93 Pa. 116 (1880). Appellants contend, however, that the authority of a court of common pleas to act in cases of lawyer misconduct, and the manner of its acting, is found exclusively in a statute, *viz.*, the Act of June 4, 1919, P.L. 384, § 1, as amended, 17 P.S. § 1665.[12] It is argued that there was no application by any committee for the convening of the special disciplinary court which acted in these cases or for the institution of the investigation of appellants' conduct, the order of October 28, 1971 [13] having

11. By the adoption in 1968 of the new Article V of the Constitution of Pennsylvania, there was established in this Commonwealth a "unified judicial system", and by the Rules of Disciplinary Enforcement adopted in 1972 pursuant thereto, this Court recognized and declared that its power to supervise the conduct of attorneys who are its officers was not only inherent, but also exclusive. *See* Preamble to the Rules, 446 Pa. xxiv.

12. Section 1 of the Act of 1919 provides as follows:
"Upon the application of any committee composed of members of the bar of any court of common pleas or of the Supreme Court of this Commonwealth, appointed, with the approval of the president judge of said court or of the Chief Justice or by the Supreme Court, for the purpose of investigating charges against the professional conduct of members of the bar of said court, the said court is hereby empowered to cause to be issued its subpoena, directed to any person whom such committee may desire to examine in connection with any such charges, requiring such person to appear before such committee, and, under oath administered by such committee, to testify all and singular those things which such person shall know concerning such charges, as well as to produce any books or papers relevant thereto."

13. *See* note 5, *supra*.

been made upon the court's own motion. This argument misreads the statute, which simply empowers a court to issue its subpoena, upon application of a court-appointed or approved investigating committee, "directed to any person whom such committee may desire to examine in connection with any such charges" of professional misconduct. The statute was so utilized in this proceeding; it does not purport to limit in any way the court's role in cases of alleged professional misbehavior and discipline to the narrow procedural framework there envisaged, and had this been the statute's purpose and effect, it would be of doubtful constitutionality.[14]

In 1936, this Court had presented to it a series of discipline cases arising out of an extensive investigation of misconduct of certain members of the Philadelphia bar. *In re Disbarment Proceedings*, 321 Pa. 81, 184 A. 59 (1936). In those cases, as in this, the procedure followed was developed by the court itself. The president judge of one of the Philadelphia courts of common pleas (No. 2) by letter to the chancellor of the Bar Association requested the appointment of a committee to conduct an investigation to ascertain "the possible connection with organized crime of lawyers who practice largely in the criminal courts". The committee was appointed, was vested with subpoena powers by the court, took testimo-

---

14. The admission of an attorney to practice before a court is a judicial act. *Hoopes v. Bradshaw*, 231 Pa. 485, 487, 80 A. 1098 (1911); *Petition of Joseph P. Splane*, 123 Pa. 527, 539–540, 16 A. 481 (1889); *Com. ex rel. Brackenridge v. Judges of Court of Common Pleas of Cumberland County*, 1 Serg. & R. 187, 192, 195 (1814). *See also Stewart v. Bechtel*, 360 Pa. 123, 128, 61 A.2d 514 (1948) (concurring opinion of Mr. Justice Charles Alvin Jones). The revocation of admission to the bar by disbarment or suspension is no less a judicial act than the admission itself. "Whether [a lawyer] shall be admitted, or whether he shall be disbarred, is a judicial, and not a legislative, question." *In re Splane, supra*, 123 Pa. at 540, 16 A. at 482. A statute which would constitute an encroachment on that function "must be regarded as a vain attempt by the Legislature to exercise a power which it does not possess". *Hoopes v. Bradshaw, supra*, 231 Pa. at 487, 80 A. at 1099.

ny, and rendered a report. The court then issued a rule upon various lawyers identified by the committee as guilty of improper conduct to show cause why they should not be disciplined. The lawyers so cited were furnished with the committee's report and a summary prepared by the committee of the testimony taken, as it affected them. After answers filed, trial proceeded before a special five-judge court (composed of the president judges of the five courts of common pleas of Philadelphia County), and the lawyers were disbarred. Appellants in those cases, as here, challenged the regularity of the proceedings. In an opinion of the Court by Chief Justice Kephart, those challenges were examined and rejected. The Court thus summarized its conclusions:

"It is the right and duty of a court to discipline its members who appear before it guilty of wrongdoing. *In re Davies*, 93 Pa. 116, 39 Am.Rep. 729. *In re Wolfe's Disbarment*, 288 Pa. 331, 135 A. 732, 50 A.L.R. 380. Courts have an inherent power to make and follow rules governing such matters or to formulate new rules as the case demands so long as no right of the member charged is invaded. But the rules thus established do not restrict the general power of the courts; the power which establishes such rules in the first instance also enables the courts to disregard such rules and adopt the methods most suitable to the occasion. A court may conduct a general investigation of unprofessional conduct in an effort to rid the practice of undesirable members. *People v. Culkin*, 248 N.Y. 465, 162 N.E. 487, 60 A.L.R. 851. It has always been proper for a court on its own motion to issue citations against practicing lawyers. *Ex parte Steinman*, 95 Pa. 220, 40 Am.Rep. 637; *Maginnis' Case*, 269 Pa. 186, 112 A. 555; *Snyder's Case*, 301 Pa. 276, 152 A. 33, 76 A.L.R. 666." 321 Pa. 101, 184 A. 68 (1936).

What was said by this Court in 1936 is dispositive of the attacks made here on the power of the court

below to proceed as it did in the conduct of the instant investigation. The court was not restricted to the preexisting procedure specified by its local rule [200(d)], whereunder a discipline trial was preceded by a complaint made to and heard by the Committee of Censors of the Philadelphia Bar Association, which then petitioned the court for a rule to show cause why the respondent should not be disciplined. All that was necessary was that, in the new procedures adopted by the court, the safeguards of procedural due process be fully observed. We are satisfied that this was done.

■ There can be no doubt, and it is not contended otherwise, that appellants were given full and specific notice of the charges against them. Appellants assert, however, that the investigative procedures that were followed fatally blended the functions of prosecutor, judge and jury, such as was condemned in *Schlesinger Appeal*, 404 Pa. 584, 172 A.2d 835 (1961). On the contrary, we think that these discrete functions were meticulously kept separate. The fact that the special prosecutor was appointed by the court and that Judge Shoyer was a member of that court in nowise vitiated the salutary principle that the same person may not act as prosecutor and trial tribunal at the same time. *Cf. Blenko v. Schmeltz*, 362 Pa. 365, 374, 67 A.2d 99 (1949). The vice in *Schlesinger Appeal, supra,* was that the disciplinary proceedings "combined in one body, namely, the Committee on Offenses", the "functions of prosecutor, judge and jury". That committee "lodged and prosecuted . . . and adjudicated the charge of unprofessional conduct whereon the Court of Common Pleas, without any hearing of witnesses, ultimately entered the order disbarring the appellant". 404 Pa. at 597, 172 A.2d at 840. In *Schlesinger*, "[t]he Committee, as prosecutor, called and examined its witnesses against the appellant and vigorously conducted an adversary proceeding against him before its own Subcommittee which, as judge, presided

over the hearings, passed upon the credibility of the witnesses, determined the inferences to be drawn from their testimony, and deduced therefrom the facts which it found". *Ibid.* As the Court in *Schlesinger* stated, that procedure "differs radically" (404 Pa. at 599, 172 A.2d 835) from that which was approved in *In re Disbarment Proceedings, supra.* We noted that, in the latter case, the Committee of Censors "acted as prosecutor only; it did not function in any manner as judge"; that, on the basis of its report, a citation was issued against the lawyers involved and there then followed "a trial of the charges against them . . . *before the President Judges of the then five numbered Common Pleas Courts of Philadelphia*". Ibid. 404 Pa. at 600, 172 A.2d at 841.

So here, the special prosecutor (picking up where the Committee of Censors had left off) conducted the investigations and acted as prosecutor; Judge Shoyer's function was neither prosecutorial nor adjudicative, but, like that of the special bar committee in *In re Disbarment Proceedings*, "was in the nature of and similar to an investigation by a grand jury", 321 Pa. at 99, 184 A. at 67, *viz.*, to determine whether the evidence presented to him "warrants the institution of formal charges" against a member of the bar of the court; [15] the three-judge court by whom the charges were heard (and which did not include Judge Shoyer) held a de novo, adversary trial conducted in all respects with due regard to the demands of fairness. Again, we note the similarity to the procedure which the Court in 1936 found to accord with due process: "[The appellants] had due notice of the charges. They were given information as to their nature, they filed answers, and filed the motion to dismiss the proceedings which is now being considered. They were given every opportunity to be heard in their own defense. They were given full latitude to examine and cross-exam-

15. *See* ¶ 3.b. of the order of court dated October 28, 1971, *supra* n. 5.

ine every witness that appeared against them. Not a shred of defense that they could have legally offered was denied them. The testimony was all heard de novo, and from that testimony the court made its findings." *In re Disbarment Proceedings, supra,* 321 Pa. at 100–101, 184 A. at 68.

■■ The appellants contend, however, that most of the evidentiary "input" against them was of no effect because it was derived in large part from the use of subpoenas by the special prosecutor which was lacking legal authorization; specifically, it is claimed that the court of common pleas was without power to grant power to the special counsel (as was done by the order of October 28, 1971, *supra* n. 5) to "compel the appearance of relevant witnesses and the production of relevant evidence by subpoena".[16] The argument is that the power to issue subpoenas must be based on statute (such as the Act of 1919, P.L. 384, as amended, 17 P.S. § 1665, *supra* n. 12), and that no statute covers the present situation. But no statute was needed for the *court* to issue subpoenas. Attendance at court to give testimony to material facts within the knowledge of a witness "is a duty incident to citizenship and one that has been recognized and enforced by the common law from an early period; as a necessary incident to its power to adjudge, a court of justice, within the sphere of its jurisdiction, has inher-

16. Appellant Portner also suggests in his brief that the subpoena power was abused in certain instances. This claim was not presented to the court below, however, and will not be entertained for the first time on this appeal. *Commonwealth v. Little,* 449 Pa. 28, 32, 295 A.2d 287 (1972); *Dollison v. Baltimore & Ohio R. R. Co.,* 446 Pa. 96, 99, 284 A.2d 704 (1971). We note that the brief of the special prosecutor asserts that Portner "complained to President Judge Jamieson about alleged improper investigative practices, none of which related in any way to evidence thereafter submitted to the Discipline Court, and was given a hearing by a master who found none of the charges to be well-founded". Appellee's Brief at 12.

ent power to compel the attendance of witnesses in proceedings before it . . . ". 58 Am.Jur. Witnesses § 9, at 27 (1948). *See also* 3 Blackstone 51, 369 (1765). As we said in *Commonwealth ex rel. Margiotti v. Orsini,* 368 Pa. 259, 263, 81 A.2d 891, 893 (1951), "[T]he power of subpoena, *except by a court,* is purely statutory" [italics in original, italics supplied].[17] The delegation of that power to the special counsel was clearly proper; that officer had been appointed by the court and vested with the responsibility of investigation for the court of a matter then peculiarly and inherently within the court's cognizance. That a statute had been the basis of the issuance of subpoenas at the request of the Committee of Censors, whose role was terminated, as previously recited, does not warrant the conclusion that a statute was also required when the court itself took over the investigation, and none of the decisions cited to us indicates to the contrary. *See Commonwealth v. Polak,* 438 Pa. 67, 263 A.2d 354 (1970); *Commonwealth ex rel. Specter v. Freed,* 424 Pa. 508, 228 A.2d 382 (1967); *Hemphill v. Lenz,* 413 Pa. 9, 195 A.2d 780 (1963); *Commonwealth ex rel. Margiotti v. Orsini, supra,* 368 Pa. at 262, 81 A.2d 891.[18]

---

**17.** The opinion in *Orsini* went on to state: "The law is well settled that the power of subpoena which formerly was exclusively a judicial power, may now be granted to nonjudicial bodies, commissions, agencies or officials *by statute, but the power and the extent of the power is to be determined in each case by the express statutory grant.*" 368 Pa. 259 at 263, 81 A.2d 891 at 893 (italics in original). *See also* the Act of June 16, 1836, P.L. 784, § 22, 17 P.S. § 2079, empowering a court of common pleas to issue writs of subpoena "into any county of this commonwealth".

**18.** This Court has by rule delegated subpoena power to Counsel for the Disciplinary Board and to the respondent-attorney in connection with investigations under the new Rules of Disciplinary Enforcement, *see* Rule 17–13. Similarly, the Court had previously endowed its earlier disciplinary arm, the Board of Governance, with subpoena power. *See* former Supreme Court Rule 17(F). It has also conferred such power on the State Board of Law Examiners, another arm of the Court, and to an applicant for admission to the bar. *See* Supreme Court Rule 14.

## III.

### THE EVIDENCE OF MISCONDUCT

We turn to the evidence, which appellants claim to be insufficient to support findings of unprofessional conduct. In appraising the evidence, we bear in mind that the misconduct must be shown by a preponderance of the evidence, which "should be clear and satisfactory", but may include logical inferences as well as direct proof. *Krehel Appeal*, 419 Pa. 86, 89, 213 A.2d 375 (1965); *Lemisch's Case*, 321 Pa. 110, 116, 184 A. 72 (1936). We are also mindful of our statement in *Moyerman's Case*, 312 Pa. 555, 562, 167 A. 579 (1933), derived from many precedents and repeated in *Samuel W. Salus's Case*, 321 Pa. 103, 184 A. 69, 70 (1936):

> ". . . in no class of cases are the findings of the trial court, based upon the evidence, of more persuasive influence upon an appellate court than in a case such as this, involving the integrity of a member of the bar. Where . . . there is sufficient evidence to warrant its conclusions, we will be slow to interfere."

*See also Kraus's Case*, 322 Pa. 362, 364, 185 A. 737 (1936); *Klensin v. Board of Governance of Pennsylvania Bar*, 312 Pa. 564, 566, 168 A. 474 (1933); *Dixon v. Minogue*, 280 Pa. 128, 124 A. 334 (1924); *Gery's Case*, 284 Pa. 121, 125, 130 A. 307 (1925).

The basic charges here involved are those of unethical solicitation. *See* Code of Professional Responsibility [herein "Code"], DR 1–102(A)(2), DR 2–103(A), EC 2–3, EC 2–8, EC 2–13. Appellants were found guilty of soliciting six cases through one Navarro Smith, whom the court below found to be an employee of both appellants. When called as a witness for appellant Shigon at trial, Smith refused to answer questions, claiming his privilege against self-incrimination. In oth-

er cases, about five in number, solicitation was found to have been made on appellants' behalf by one Anthony Ciervo, proprietor of an insurance agency specializing in automobile collision insurance. The court found that Ciervo had a "business relationship" with appellants, who handled his subrogation claims without charge. One of Ciervo's employees testified that it was "office policy" to refer policyholders to the Shigon firm. Approximately six more cases were found to have been solicited through other intermediaries.

The court found that in some fifteen cases, including some that were solicited and some that were not, the appellants had submitted, through collusive arrangements with six doctors, fraudulent and inflated medical claims. Appellants were accordingly found guilty of engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation, and conduct prejudicial to the administration of justice, proscribed by DR 1–102(A)(4) and (5) of the Code. The proof of the inflated and fraudulent nature of the claims in question was supplied in each case by the testimony of a client-witness that he was treated many fewer times than that reported to the insurance carrier. Proof of appellants' knowledge of the fraudulent nature of the claims was sometimes by direct testimony, and in other cases by inference from the known facts surrounding a claim.

In six cases of solicitation and in two other cases where there was no finding of solicitation, appellants were found to have filed retainer agreements [19] which contained false information concerning the source of the case (*i. e.*, by whom the client was recommended to the attorney). The court found this conduct also to be violative of DR 1–102(A)(4) and (5) of the Code.[20]

19. These filings were with the Prothonotary of the Court of Common Pleas of Philadelphia, as required by Rule 202(f) of that court, supplementing Pa.R.C.P. 202.

20. Appellant Shigon asserts that Philadelphia Rule 202(f) is unconstitutional in that it singles out contingent-fee agreements in-

Finally, but by no means of least importance, the same Code provisions were found to have been violated in five cases wherein appellants were found guilty of attempting to suborn the testimony of a client-witness and so impede the investigation.

No useful purpose would be served by a detailed recitation of the evidence pertaining to the particular cases involving these four types of misconduct. Suffice it to say that we have reviewed the record in conformity with the Act of 1879 [21] and are satisfied that the evidence of improper conduct did indeed preponderate and was "clear and satisfactory". In the words of the opinion of the court en banc below:

"The evidence establishing a pattern of improper solicitation is clear and convincing. Moreover, after being retained, the respondents acted in a completely unprofessional manner. In a number of cases, there was no communication with the client until the case was settled, usually on the basis of inflated medical bills. The client was not consulted before the settlement was made and was merely told to come into the office to receive his share of the distribution, where the client, for the first time, met either Shigon or Portner.

\* \* \* \* \* \* \* \*

"This case presents a melancholy record of unprofessional conduct on the part of doctors, as well as un-

volving personal injury claims, workmen's compensation claims, and land condemnation claims, thus violating the equal protection clause. It is further stated that the use of such agreements as a basis of investigation violates the privilege against self-incrimination contained in the Fifth Amendment. We find no merit in either argument. *See Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); *Shapiro v. United States,* 335 U.S. 1, 68 S. Ct. 1375, 92 L.Ed. 1787 (1948); *State Real Estate Commission v. Roberts,* 441 Pa. 159, 271 A.2d 246 (1970), cert. den., 402 U.S. 905, 91 S.Ct. 1367, 28 L.Ed.2d 645. *Cf. Spevack v. Klein,* 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967).

21. Act of May 19, 1879, P.L. 66, § 1. This section has been suspended by Supreme Court Rule 17–24(a)(5).

professional conduct on the part of lawyers, in violation of the Code of Ethics governing both professions. There was a sordid arrangement for the mutual benefit of the doctors and the lawyers."

## IV.

## PORTNER'S CLAIM OF NON-CULPABILITY

Appellant Portner disputes the finding of the court below that the charges proved by the evidence "are applicable to both respondents and that they are both subject to discipline with respect to charges that are sustained".[22] He states that there is no showing that he was either a partner of Norman Shigon, or held himself out to be such. Even if partnership be conceded, he argues, there still must be knowledge and acquiescence on Portner's part of Shigon's unethical acts to make Portner liable. *Samuel W. Salus's Case*, 321 Pa. 103, 104, 184 A. 69 (1936); *Bar Association v. Brasley*, 81 P.L.J. 149 (1933).

The petition for the imposition of discipline alleged that the appellants were or held themselves out to be partners engaged in the practice of law. The answers denied this allegation, and stated that Portner was but a salaried employee of Shigon. While neither appellant testified at the trial, the record shows that they were associated together in the practice of law for something over five years. During approximately the first two years of this time, Portner, the younger of the two, was admittedly in the position of an associate of Shigon. Thereafter, they used the firm name of "Shigon and Portner" in the manner customary with law firms—on the office door, on stationery and letterheads, in the legal directory and in the telephone directory. Letters to insurance companies were signed by either Shigon or Portner for the firm; checks were often received payable to the

22. Opinion of the Court En Banc, Portner Record at 280a.

order of "Shigon and Portner" as co-payees with the client. On the other hand, Portner had letterheads of his own, and used them in some instances; the firm's accountant gave testimony that Portner continued to be carried on the books as an employee as long as he and Shigon were together, and that his "quite substantial" salary payments were subject to the usual tax and other withholdings.[23]

The evidence was not conclusive one way or the other as to the existence of a partnership, and the lower court did not find that one did exist. It concluded that "there was at least a de facto arrangement whereby they [appellants] both took part in all of the personal injury business brought into the office and both profited from this business"; that they "were jointly engaged in unethical and improper practices"; and that "[e]ach was fully aware of the manner in which their practice was conducted".

We are satisfied that these conclusions were warranted. Portner was found guilty not as a partner, but by reason of his direct participation in and sharing of responsibility for at least eight of the cases involved, and his knowledge of the manner in which the affairs of the office were carried on. The activities of the runner,

23. Under Rule 17–24, this Court has received an authenticated copy of an adjudication entered October 17, 1973 in the case of *United States of America v. Sheldon R. Portner*, No. 73–405 in the District Court of the United States for the Eastern District of Pennsylvania. From the record supporting this judgment, it appears that Portner pleaded nolo contendere to two counts of filing false and fraudulent income tax returns for the years 1970 and 1971, and in each count received a suspended prison sentence, was placed on probation for 3 years, and fined $1,500. The indictment to which the pleas were entered states that the joint taxable income of Portner and his wife for the years in question was $30,733.70 and $47,054.04, respectively. Because of the pendency of the instant appeal, action under Rule 17–24 was deferred temporarily. In light of the disposition of the appeal which we make today, there will be no need for an additional suspension prior to disposition of a disciplinary proceeding before the Disciplinary Board based on the federal conviction.

Smith, whom the court found on adequate evidence to be an employee of the firm, redounded to the benefit of Portner as well as Shigon; clients obtained through Smith's efforts were sent to Portner as well as to Shigon. Portner's efforts to influence the testimony of witnesses had to do with cases where the misconduct of Shigon was at issue, and similar attempts by Shigon were with reference to cases of Portner misconduct. The law office of Shigon and Portner consisted of the two appellants and not more than two other persons associated with them during portions of the period under review. The practice was almost exclusively the processing of personal injury claims on behalf of claimants or plaintiffs. It is not possible to read the record of that practice as it is revealed in the evidence in this case and not be satisfied that Portner, whatever his exact relationship with Shigon, held himself out as a partner, had knowledge of the manner of operation of the firm, and actively participated in its business.

* * * * * * * *

As we observed in *Moyerman's Case,* supra, 312 Pa. at 564, 167 A. at 583, speaking through Mr. Justice Drew, "[t]he law is an ancient and honorable profession. Throughout its whole existence it has been maintained in the confidence of the people by the integrity of its members. . . . The practicing members of the profession are the arms of the court, which exists only for the administration of justice, and as officers of the court they are held out to the community as worthy of special trust and confidence. The court itself would fail its duty to the public if it did not, when an attorney has proved himself unworthy, withdraw its endorsement and strike his name from the rolls. *Davies' Case,* 93 Pa. 116." Long ago, Chief Justice Gibson stated that "[n]o class of the community is more dependent on its reputation for honor and integrity [than are lawyers]". *Austin's Case, supra.* These typical expressions from our opinions as to

the nature and obligations of the legal profession, and the duties of the bench and the bar, acting together, to maintain the integrity of the profession and the confidence of the public, could be multiplied many times from decisions of our sister states. Most recently, these principles found helpful reiteration by the Court of Appeals of Maryland in *Maryland State Bar Association, Inc. v. Spiro T. Agnew*, 318 A.2d 811 (1974).

The court below was fully justified in finding that the appellants had abused their positions as lawyers and as officers of the court, that their breaches of the code of professional responsibility were serious in nature, and that imposition of discipline is required. In electing to suspend rather than disbar appellants, the court considered the "impressive character evidence offered on behalf of both respondents, and the fact that there is no record of any previous complaints, disciplinary proceedings or actions against either of them". In view of the repeated pattern of misfeasance over an extended period, we think appellants may consider themselves fortunate to have escaped the penalty of disbarment.

The order of April 2, 1973 is affirmed, and shall become effective thirty (30) days from the date of filing of this opinion.

ROBERTS, J., filed a concurring opinion.

MANDERINO, J., filed a concurring and dissenting opinion.

ROBERTS, Justice (concurring).

After independent review of the record,* I conclude that the Special Disciplinary Court properly imposed disciplinary sanctions upon Shigon and Portner. Furthermore, the procedure employed by the Special Judicial In-

---

* The Act of May 19, 1879, P.L. 66, § 1, 17 P.S. § 1663 (1962), mandates that this Court review attorney disciplinary cases de novo.

vestigation in this case was completely consistent with the constitutional rights of those under investigation. Therefore, I concur in the result.

MANDERINO, Justice (concurring and dissenting).

I concur in the finding of guilt on the charges of engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation for submitting false and inflated medical claim reports in personal injury settlements with the insurance carriers, and in the findings of guilt for suborning false testimony and impeding the Special Judicial Investigation. I concur in the court's decision as to appellants' failure to comply with Philadelphia Court Rule 202 for reasons stated in my concurring and dissenting opinion in *In re Berlant*, Pa., 328 A.2d 471 (filed October 16, 1974).

I dissent from the Court's decision as to the charges of improper solicitation for the reasons stated in my concurring and dissenting opinion in *In re Berlant*, Pa., 328 A.2d 471 (filed October 16, 1974). I also dissent from the majority's approval of the grant of subpoena authority to a special prosecutor.

The authority to issue subpoenas is a *judicial authority* which can never be delegated to a prosecutor. The prosecutor may *request* the issuance of a subpoena, but a neutral judicial officer must decide whether there is a basis for the issuance of the subpoena. If there is no basis, the subpoena does not issue. Fishing expeditions are not permitted under the Fourth Amendment or the Pennsylvania Constitution.